LUBRICATION AND MAINTENANCE,
INC., Plaintiff,

v.

UNION RESOURCES COMPANY, INC.,
Friedrich W. Winter and Richard C.
Belli, Defendants.

No. 80 Civ. 5357.

United States District Court,
S. D. New York.

Sept. 22, 1981.

Beldock, Levine & Hoffman, New York City, for plaintiff; Jon B. Levison, New York City, of counsel.

Gifford, Woody, Palmer & Serles, New York City, for defendants; James P. Beggans, Jr., Geoffrey W. Parnass, New York City, of counsel.

## OPINION

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

This case presents a series of issues the most basic of which is whether Lubrication and Maintenance, Inc. ("L&M") and Union Resources Company, Inc. ("Union") entered into a binding agreement in February 1980 for the purchase and sale of molybdenum disulfide. After a careful review of the Court's trial notes as the trial progressed, a word by word reading of the trial transcript and observation of the witnesses who differed sharply on material matters, the Court finds that an agreement was entered into on February 6, 1980 whereby plaintiff L&M agreed to sell and the defendant Union agreed to buy 46,400 pounds of molybdenum disulfide. Delivery was to be made in four lots of 11,600 pounds each in April, June, August and October 1980. A price was fixed at $10.15/lb. product plus an escalation based on the increase in the Climax price over that published on October 15, 1979.[1]

The escalation clause reads as follows:

The price for each shipment will be $10.15 per pound product plus 50% of any escalation in the Climax domestic price schedule beyond the prices published October 15, 1979, namely: T.F. $5.10/lb. product.

Another issue, discussed hereafter, is the interpretation of this provision as to which the parties disagree.

It is undisputed that after extensive prior negotiations between David A. Gresty ("Gresty"), President of L&M, and Friedrich W. Winter ("Winter"), Vice-President of Union, an agreement as above described was concluded on February 6, 1980. This agreement was memorialized by a written document setting forth all the material terms: quantity, price, manner and time of delivery, signed on that date by Gresty and Winter on behalf of their respective principals and all handwritten insertions were initialled by each. Although the agreement was signed on February 6, 1980, it was dated February 1 and it was agreed that a "clean" copy should be retyped and re-executed by the parties. This was done by Winter, who changed the form but not the substance of the February agreement. He then signed two copies of the retyped agreement, which was dated February 21, 1980, and mailed them that day to Gresty. The price term is identical to that set forth in the document dated February 1, 1980. Several days after their receipt, Gresty executed the "clean" copies and returned one to Winter with an insertion referred to hereafter. Upon the foregoing, the Court finds that the parties entered into a binding agreement on February 6, 1980 (dated February 1, 1980) (hereafter the February agreement), all the terms of which were fully set forth in the documents signed and initialled by them on that day, and that the subsequently retyped agreement dated February 21, 1980 is simply a clean typewritten copy of their previously signed agreement.

The next issue is the interpretation of the price escalation clause. Gresty, in executing the two "clean" copies, one of which he returned to defendants, inserted after the escalation clause the following: "e. g. If the Climax price increases 10%, L&M increases 5%" which was his understanding of the price increase provision. Winter contends to the contrary that the escalation was to be computed on a "dollar for dollar

[1.] The Climax Division of Amax, Inc. is the major producer of molybdenum products in the United States and throughout the world.

basis." [2] Winter testified that at a conference on March 7, 1980 attended by him and Belli, also an executive of Union, Gresty agreed to the dollar for dollar interpretation of the escalation clause; and in addition also agreed to add a clause for renegotiation of the contract in the event of a substantial fluctuation in the molybdenum price; and that a letter dated March 10, 1980 sent to L&M by Union reflects this understanding. Gresty denied that any modification of the February 1980 agreement to provide for renegotiation was ever agreed to; further, that he never received the March 10, 1980 letter confirming the alleged renegotiation amendment and indicating that plaintiff accepted defendants' dollar for dollar interpretation of the escalation clause.

■ The issue first to be considered is the effect of the interlineation in the "clean" retyped copy of February 21 that Gresty returned to Union unaccompanied by any letter or explanation. Gresty testified it was an attempt to clarify the escalation clause which appeared to him somewhat ambiguous. The defendant contends, that although the clause is in the identical language in the documents of February 6 and the "clean" one of February 21, that the insertion establishes in fact at no point was there a meeting of the minds and hence no contract existed between the parties—in short, the insertion was a counter offer as to a price increase. The Court has already determined that the parties entered into a valid contract on February 6th. The defendant's contention disregards the fact that the retyped "clean copy" returned by Winter to Gresty contained every essential term that the parties had agreed upon and

that was contained in the fully executed agreement dated February 1, 1980. Indeed, if Winter and Gresty had decided not to have a "clean" copy, there could not be the slightest basis for any claim that a binding agreement was not in effect. Defendant's alternative claim is that the insertion by Gresty was a term additional to or different from the February agreement and that the insertion did not become part of the agreement since it is a material matter which the defendant upon its own version did not accept. In this circumstance, the February agreement remained in full force and effect with the escalation clause exactly as set forth therein.[3] This constituted their valid and binding agreement with only the meaning of the escalation clause in dispute—an issue that arose thereafter when Gresty inserted his understanding of it.

Thus the issue is whether the parties agreed, as defendants contend, at a March 7 meeting to a common interpretation of the escalation clause. Union contends, as noted above, that at the conference held on March 7 Gresty agreed (1) that any price escalation would be computed on the basis of Union's interpretation of the escalation clause, and (2) to amend the contract to include a price renegotiation clause. As previously noted, Gresty categorically denies this and charges that no such agreement was reached and that the March 10 letter purporting to confirm such agreement has been fabricated for the purpose of this litigation.

■ Both Winter and Belli testified that following the March 7 conference with Gresty they returned to the offices of Union where the bulk of the letter confirming what occurred at their meeting with Gresty

2. Under the percentage method, the contract price would increase by one-half of the percentage increase in the Climax price such that if the Climax price rose 25% the contract price would rise 12½%. Under the "dollar for dollar" interpretation the contract price increase would be one-half of the monetary rise in the Climax price such that if the Climax price rose $.80 the contract price would rise $.40. Since the base price of the contract was $10.15, almost twice the amount of the Climax price of $5.10, the percentage method results in an in-

crease almost twice as large as the "dollar for dollar" method.

3. N.Y.U.C.C. § 2–207(2) states in pertinent part:

The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

\* \* \* \* \* \*

(b) they materially alter it.

was typed but that the secretary failed to complete the last three or four lines because his job had suddenly been terminated; that on the Monday following, March 10, the letter was submitted by Winter for typing and mailing according to the usual procedure in Union's office. Neither Winter nor Belli testified that in fact it was mailed. Union did not call the secretary who they testified in the normal course of events would have typed and mailed the letter. However, the plaintiff subpoenaed her and she denied either typing or mailing the letter; she gave a detailed explanation of why the letter could not have been typewritten by her and of her certainty that she had never seen it until shortly before the trial. She impressed the Court as a credible and believable witness. Thus nothing more need be said on these sharply contested issues than that the defendant failed to sustain its burden of proof that on March 7 the parties agreed to add a renegotiation clause to the contract, that the interpretation of the escalation clause was to be computed on a dollar for dollar basis, and that a letter confirming such agreement was mailed to the plaintiff.

■ The parties' differing contentions as to the proper interpretation of the escalation clause, which emphasize its ambiguity, raises the issue of what the parties intended by the phrase "plus 50% of any escalation in the Climax domestic price schedule beyond the prices published October 15, 1979." Determination of the intent of the parties at the time they entered into the contract is not governed by their unexpressed subjective views,[4] but rather by what they wrote, their acts, conduct and all surrounding circumstances.[5]

■ After February 1980, when the parties entered into their contract, the Climax price increase brought into play the escalation clause. On April 11, 1980, L&M made the first shipment under the contract, 11,-600 pounds of molybdenum as provided therein. Plaintiff invoiced the shipment at $11.02/lb., or a total of $127,832 based upon its view of the meaning of the escalation clause. The defendant made payment at $10.59/lb., or a total of $122,844 which reflected its understanding of the escalation provision. L&M accepted the payment on May 13 without protest; it wrote no letter nor made any statement to Union that acceptance of the payment was on account, that it was not in full payment of the amount due, or that it was not in accord with the escalation provision. It was not until early June that L&M's attorneys first asserted a claim which triggered an exchange of letters between them and defendant's attorneys challenging one another's positions not only with respect to the computation under the escalation provision, but also as to the defendant's claim that the parties had agreed to a renegotiation of their agreement dependent on market fluctuations. Whether plaintiff accepted the payment for the first shipment because of its concern as to defendant's financial stability at that time is not clear. However, that plaintiff did accept without protest the payment based on defendant's interpretation of the escalation clause warrants a finding that it reflected the intent of the parties and was a practical construction of the clause.[6] The Court finds that the dollar for dollar method of computation reflects the intent of the parties.

4. In re Smith's Will, 254 N.Y. 283, 289, 172 N.E. 499 (1930); Dillon v. Anderson, 43 N.Y. 231, 236–37 (1870) (contract); Tarantola v. Williams, 48 A.D.2d 552, 371 N.Y.S.2d 136, 139 (1975); Richardson on Evidence, § 364(1) (10th ed.).

5. O'Neil Supply Co. v. Petroleum Heat & Power Co., 280 N.Y. 50, 55, 19 N.E.2d 676 (1939); Rogers v. Niforatos, 57 A.D.2d 984, 394 N.Y. S.2d 473, 476 (1977).

6. See N.Y.U.C.C. § 2–208; Kama Rippa Music, Inc. v. Schekeryk, 510 F.2d 837, 842 (2d Cir. 1975) (applying New York law); Viacom Int'l Inc. v. Lorimar Productions, Inc., 486 F.Supp. 95, 98 (S.D.N.Y.1980); Brooklyn Public Library v. City of New York, 250 N.Y. 495, 501, 166 N.E. 179 (1929); Webster's Red Seal Publications Inc. v. Gilberton World-Wide Publications, Inc., 67 A.D.2d 339, 415 N.Y.S.2d 229, 232 (1979), aff'd, 53 N.Y.2d 643, 438 N.Y.S.2d 998 (1981).

Under the contract three shipments remained to be made in June, August and October 1980. Aware of the defendant's financial difficulties and its litigation with one of its shareholders, L&M demanded of Union, pursuant to U.C.C. § 2–609,[7] that it furnish adequate assurance of its due performance as to the remaining shipments under the contract. Union failed to give such assurance; instead, in response, it asserted a right to negotiate the contract, referring to its letter of March 10 as incorporating the claimed renegotiation as an amendment to the original contract. Since the Court has already found that no such renegotiation had been agreed to by L&M and the defendant failed to give assurance of performance, it thereby repudiated and breached the agreement.[8] Accordingly, plaintiff is entitled to recover damages for any loss occasioned by defendant's breach of the contract with respect to the three remaining shipments, a total of 34,800 pounds, to be delivered in lots of 11,600 pounds each in June, August and October. Plaintiff had available a sufficient supply of molybdenum to meet the second shipment and part of the third at a cost to it of six dollars per pound. The evidence also establishes that there was available to it sufficient amounts to supply the balance of the contract, also at six dollars per pound. The price which the defendant agreed to purchase was $10.15 per pound plus any increase in cost as provided for under the escalation clause. Since this Court has found that an increase if required is to be calculated on a dollar for dollar basis, that is the amount that will be applied. The Climax increase during the period of delivery of the balance was 88 cents per pound, one half of which, 44 cents, is to be added to the $10.15 per pound, for a total of $10.59 per pound. Deducting therefrom the cost of $6 leaves a loss of $4.59 per pound for 34,800 pounds, for a total of $159,732, for which judgment may be entered against Union.

The plaintiff also seeks to hold the individual defendants who were officers of Union liable for the damages claimed. However, the evidence establishes they acted solely in their capacities as officers of Union and may not be held liable for its obligations. Accordingly, judgment is rendered in favor of the individual defendants.

Finally, plaintiff seeks to recover punitive damages based upon a claim that the March 10 letter was a fabricated document and that the defendant's principal witnesses testified falsely to establish its validity. While this has been the contention of the plaintiff, the Court's finding is that the defendant Union has failed to sustain its burden of proof on the issue of renegotiation, based upon the fair preponderance of the evidence rule that is applied in civil actions. Punitive damages are to be granted only in cases of egregious conduct.[9] Generally, New York State's public policy has not favored punitive damages for a mere breach of contract "for in such a case only a private wrong, and not a public right is involved ... [citing cases]." *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358, 386 N.Y.2d 831, 833, 353 N.E.2d 783, 785 (1976). To grant punitive damages in an ordinary breach of contract case would open further the floodgates of litigation on that issue. It

---

7. N.Y.U.C.C. § 2–609. RIGHT TO ADEQUATE ASSURANCE OF PERFORMANCE

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

8. N.Y.U.C.C. § 2–609(4) provides:

After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract. See N.Y.U.C.C. § 2–610.

9. *James v. Powell*, 19 N.Y.2d 249, 260, 279 N.Y.S.2d 10, 18, 225 N.E.2d 741, 749 (1967); *Knieriemen v. Bache Halsey Stuart Shields, Inc.*, 74 A.D.2d 290, 427 N.Y.S.2d 10, 13 (1980); *Sanfilippo v. Metropolitan Life Ins. Co.*, 74 A.D.2d 600, 424 N.Y.S.2d 511, 512 (1980).

is not unusual for businessmen to disagree as to what their final agreement means. Unfortunately, it is all too true that in many such cases the principals involved in the negotiations give sharply different and irreconcilable versions of events. In such cases the finder of the fact makes his determination upon a standard of proof less stringent from that required to justify a warrant of criminal conduct. The application for punitive damages is denied.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.