**PARAGON RESOURCES, INC.,**
Plaintiff-Appellee,

v.

**NATIONAL FUEL GAS DISTRIBUTION CORPORATION, Defendant-Appellant.**

No. 81–3813
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Jan. 21, 1983.

Rehearing Denied Feb. 22, 1983.

Phillips, Lytle, Hitchcock, Blaine & Huber, Heino H. Prahl, Buffalo, N.Y., Cook, Yancey, King & Galloway, F. Drake Lee, Jr., Shreveport, La., for defendant-appellant.

Blanchard, Walker, O'Quin & Roberts, William T. Allen, III, Shreveport, La., Kavinoky, Cook, Sandler, Gardner, Wisbaum & Lipman, Allan R. Lipman, Buffalo, N.Y., for plaintiff-appellee.

Before CLARK, Chief Judge, POLITZ and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We review an interpretation of an escalator provision in a gas purchase agreement between Paragon Resources, a natural gas producer, and National Fuel Gas Distribution Corp., a gas distributor. The escalator provision required Distribution Corp. to increase the price it paid Paragon for natural gas each year by the amount that "the average cost of gas" supplied by three pipelines to Distribution Corp. and related companies had increased. Distribution Corp. reads the escalator as permitting it to reduce its price to Paragon by the amount of refunds the three pipelines were required to make by the Federal Energy Regulatory Commission. Paragon reads "average cost" to mean the average price that Distribution Corp. actually paid in the given year, with no deduction for any refunds. The district court, after a bench trial, agreed with Paragon and awarded it damages for breach of contract. Concluding that the district court applied correct legal principles and that its factual determination was supported by the evidence, we affirm.

*(a) The Gas Purchase Agreement*

Distribution Corp.'s predecessor, Iroquois Gas Corp., was a subsidiary of National Fuel Gas Co., a corporation that, along with its subsidiaries, purchased natural gas and sold it to retail customers in New York, Pennsylvania, and Ohio. Some of the gas purchases were from interstate sources, whose rates were then regulated by the Federal Power Commission, now the FERC. Other purchases were from intrastate sources, including producers in western New York.

In February 1974, there was concern over available supplies of gas and representatives of Iroquois and two other subsidiaries met in Warren, Pennsylvania, to review pricing of intrastate natural gas. The three companies hoped to develop a pricing policy that would stimulate local production,

which then made up less than five percent of their purchases. At the Warren meeting they agreed to include a price escalation clause in the contracts with local producers. Under the escalator the price paid per thousand cubic feet, "MCF," would increase each year by the amount that the average cost of gas purchased by National Fuel Gas Co. and its subsidiaries in the interstate market from three pipeline companies, Tennessee Gas Pipeline Co., Texas Eastern Transmission Corp., and Transcontinental Gas Pipeline Co., had increased during the previous year.

The Natural Gas Act permits natural gas companies within the jurisdiction of the FERC to increase rates pending determination of reasonableness, subject to the Commission's right to suspend the new rates for up to five months. At the same time, the natural gas company is liable for a refund if the new rates are not found just and reasonable. 15 U.S.C. § 717c(e). *See also United Gas Pipe Line v. FERC*, 657 F.2d 790, 793 (5th Cir.1981). The subsidiaries agreed that the escalator would not adjust for amounts paid the three pipelines that were subject to refund but would guarantee a minimum annual increase of $0.02 per MCF.

Paragon was formed in 1972 and started drilling in western New York in 1973 with plans for additional production. In June 1974 Iroquois and Paragon entered into a gas purchase agreement. The agreement, effective July 1, 1974, contained the standard price escalator:

Beginning January 1, 1975, and on each anniversary of that date, the above prices shall be increased by the amount in cents per one thousand (1,000) cubic feet, calculated to the nearest tenth of a cent, that the average cost of gas volumes actually purchased by National Fuel Gas Company and its subsidiary companies from Tennessee Gas Pipeline Company, Texas Eastern Transmission Corporation and Transcontinental Gas Pipeline Company during the preceding calendar year increased from the next preceding calendar year. In determining the average cost of

gas actually purchased from said three pipeline suppliers, only final adjudicated one hundred percent (100%) load factor rates will be used, excluding sums collected subject to refund, demand credits and curtailment surcharges. In no event shall such annual increase be less than $0.02 per MCF.

### (b) The 1975 Amendment

Shortly thereafter, National Fuel Gas Co., Iroquois, and the other subsidiaries were reorganized. Distribution Corp., a newly-formed corporation, was assigned the "intrastate" assets of the system, including the gas purchase agreement with Paragon. John Fox, Assistant Secretary of Distribution Corp., was responsible for the negotiation and administration of contracts with local producers. Fox was concerned that the price escalator clause did not provide an adequate incentive for local production given the time necessary to finally adjudicate rates. He discussed deleting the reference to "final adjudicated rates" in the standard price escalator with other Distribution Corp. officials. On February 10, 1975, Fox wrote J.C. Templeton, the President of Paragon, as follows:

Pursuant to the escalation clause contained in section numbered VII on page 10 in the above contract, National Fuel Gas has computed the escalation to be 14.3 cents per MCF for calendar year for the method shown on attached Exhibit 'A.'

This computation was made by dividing the total dollars paid during calendar years by the total MCF delivered. Amounts subject to refund (unadjudicated rates) were not deducted from this calculation, a method which will always be to the benefit of the producer, because of the complexity of the calculation.

If this meets with your approval, this letter shall act as an amendment to the contract, substituting the following language in section numbered VII:

\*     \*     \*     \*     \*     \*

(b) Beginning January 1, 1975, and on each anniversary of that date, the

above prices shall be increased by the amount in cents per one thousand (1,000) cubic feet, calculated to the nearest tenth of a cent, that the average cost of gas volumes actually purchased by National Fuel Gas Company and its subsidiary companies from Tennessee Gas Pipeline Company, Texas Eastern Transmission Corporation and Transcontinental Gas Pipeline Company during the preceding calendar year increased from the next preceding calendar year. In no event shall such annual increase be less than $0.02 per MCF.

Templeton signed and returned the letter.

### (c) Refunds

The letter from Fox to Templeton also contained a schedule that listed the sums paid and amounts of gas purchased from the three parity pipelines in 1973 and 1974 and calculated the increase in average cost. The schedule did not reflect any "refunds" received by National Fuel Gas Company or its subsidiaries from the three pipelines in those two years. Similarly, Distribution Corp.'s calculation of the price increase effective January 1, 1976, did not reflect refunds received in 1975, nor did its calculation of the price increase for January 1, 1977, reflect refunds for 1976. In addition, throughout 1977 Distribution Corp. furnished projections of the 1978 increase that did not take refunds into account.

On October 24, 1977, Tennessee Gas Pipeline Co. refunded $16,326,064 to one of National Fuel Gas Co.'s subsidiaries. This was by far the largest refund that any of the system companies had received from the three pipelines during the years 1973–77. By comparison in October 1974 Tennessee had been ordered to pay $1,164,870; in March 1976 Texas Eastern Transmission Corp. had been required to pay $1,084,052; and in August 1977 Texas Eastern had been required to pay $2,746,547. There were many smaller refunds during that time.

The very sizeable Tennessee refund resulted from a rate proceeding in progress since 1973. An administrative law judge recommended disallowance of most of the rate increase sought by Tennessee in 1975. Yet it was March of 1978 before Distribution Corp. advised Paragon that refunds were included in the average cost of gas calculation. It also continued to change its refund formula using at least three distinct approaches.

First, in 1978 Distribution Corp.: (i) allocated the refunds received during 1975, 1976, and 1977 to the years to which they were attributable; (ii) calculated per MCF refund figures for each of those years; (iii) subtracted the sum of those figures from the difference between the average cost of gas for 1977 (not counting refunds) and the average cost of gas for 1976 (not counting refunds).

Second, Distribution Corp. in 1979 used the "year of receipt method" by which it (i) subtracted refunds received in 1978 from the amount paid for gas in 1978 in determining the average cost of gas for 1978, (ii) made the same calculation for 1977, and (iii) subtracted the 1977 figure from the 1978 figure. This 1979 method was also used in 1980, except that no deduction for refunds was made where the refunds were attributable to a year preceding a year in which only the minimum $0.02 per MCF price escalation was awarded.

At the time of trial Distribution Corp. adopted a third method, the "perfect hindsight theory." Under this theoretically simple method, refunds are allocated to the year to which they are attributable, then price escalators for past years are calculated as if the refunded amounts had never been collected from National Fuel Gas Co. or its subsidiaries. The calculation is repeated each year, and either Paragon or Distribution Corp. is repaid where appropriate.

### (d) State Regulation

Although intrastate gas sales are not within the jurisdiction of the FERC, Distribution Corp.'s resale of such gas to retail customers within New York is regulated by the New York Public Service Commission. The NYPSC does not permit costs to be

automatically passed through. In May 1975, after Distribution Corp. had inserted a one-time 30.7 cent increase into the price escalation clause, the NYPSC ordered Distribution Corp. to justify the price increase and the price escalation clause. After the proceeding the NYPSC ordered that a price escalation clause tying increases in the cost of locally produced gas to certain interstate rates be included in *new* intrastate gas purchase agreements, but in the plain language of the district court did not "fool with the previous Paragon language."

### (e) The Present Action

In September 1978, approximately six months after Distribution Corp. began subtracting refunded amounts in calculating the price·escalator, Fox became president of Paragon. On December 11, 1978, Paragon sued for a declaratory judgment and for breach of contract claiming that deducting the refunds breached the contract. After a bench trial, the district court concluded from the "facts and circumstances" surrounding the decision to amend the escalator that Distribution Corp. did not intend refunds to be taken into account and that therefore Distribution Corp. had breached the contract in March 1978.

Distribution Corp. argues (1) that the district court's interpretation of the escalator provision is not subject to the clearly erroneous rule, and (2) that even if it is, the court's finding that the 1975 amendment precluded consideration of refunds is clearly erroneous.

### Standard of Review

"The generally accepted rule is that the interpretation of a contract is a question of law, not fact, and appellate review is not limited to the 'clearly erroneous' rule. [Citations omitted.] An exception to this rule is the situation in which extrinsic evidence has been used in interpreting an ambiguous contract." *Thornton v. Bean Contracting Co.*, 592 F.2d 1287, 1290 (5th Cir.1980). The logic of this rule is obvious: When contract interpretation does not require resort to extrinsic evidence,

there are no credibility choices to be made and the appellate court and district court survey the same terrain. This of course ·assumes the correctness of the decision to consider extrinsic evidence. That is, the clearly erroneous rule applies when extrinsic evidence is used to interpret an *ambiguous* contract, and ambiguity is a question of law. *See In re Stratford of Texas, Inc.*, 635 F.2d 365, 368 (5th Cir.1981). It follows that we must first review the decision that the contract terms are ambiguous. If we find ourselves in agreement with the district court decision we thereafter accord "clearly erroneous" deference to its interpretation of that contract in light of extrinsic evidence.

This simple construct is consistent with New York law, which the parties have stipulated controls this case. *See Broad v. Rockwell International Corp.*, 642 F.2d 929, 946–948 (5th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) (applying New York law); *West, Wier & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 307 N.Y.S.2d 449, 451–52, 255 N.E.2d 709, 711–712 (1969).

This construct rests on an assumption that extrinsic evidence is only admissible when the contract is ambiguous. Yet since the adoption of the Uniform Commercial Code in New York the Code "definitely rejects" the requirement that the court determine that contract language is ambiguous before admitting evidence of course of dealing, usage of trade, or course of performance. N.Y.U.C.C. § 2–202, Official Comment 1. Thus, in *Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040 (5th Cir.1971), we applied New York law and Article 2 of the U.C.C. in holding that the trial court had erred in refusing to admit evidence of course of dealing and usage of trade to show that the parties had not intended to limit to eighteen months a subordination agreement expressly limited by its terms to such a duration. *See also Division of Triple T Service, Inc. v. Mobil Oil Corp.*, 60 Misc.2d 720, 304 N.Y.S.2d 191, 202–203 (Sup.Ct.1969), *aff'd without opinion*, 34 A.D.2d 618, 311 N.Y.S.2d 961 (1970)

("The Uniform Commercial Code has effected a change as regards sales contracts and evidence of custom or usage in the trade is admissible to determine the parties' true intention even if the contract terms are not ambiguous ..."). *But see Federal Express Corp. v. Pan American World Airways,* 623 F.2d 1297, 1300–1301 (8th Cir.1980) (applying New York law) (implying that ambiguity is a prerequisite to the admissibility of trade usage).

█ If the contract provision appears ambiguous after evidence of course of dealing, usage of trade, and course of performance has been admitted, other extrinsic evidence may then be admitted as well. For example, in *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F.Supp. 987, 991–995 (S.D. N.Y.1968) (applying New York law), the court allowed Whitelawn to introduce course of dealing, usage of trade, and course of performance evidence that a contract provision giving it "the non-exclusive right to purchase" Eskimo products forbid Eskimo from competing with it. "[A]lthough the term 'non-exclusive' as used in the Package Deal does not on its face appear to be ambiguous," Whitelawn was afforded the opportunity to show that it was ambiguous and Eskimo the opportunity to rebut such proof. This evidence was to be considered by the court at a preliminary hearing. Only if the court then determined that the contract was ambiguous would "oral statements of the parties as to what they intended" then be admissible. *See also Chase Manhattan Bank v. First Marion Bank,* 437 F.2d at 1047–48.

The U.C.C. thus adds a third level to a traditional two-level inquiry. Instead of asking, "Were the contract terms ambiguous" and then, "If they were ambiguous what do they mean in light of extrinsic evidence" the Code poses *three* inquiries:

1. Were the express contract terms ambiguous?

2. If not, are they ambiguous after considering evidence of course of dealing, usage of trade, and course of performance?

3. If the express contract terms by themselves are ambiguous, or if the terms are ambiguous when course of dealing, usage of trade, and course of performance are considered (that is, if the answer to either of the first two questions is yes), what is the meaning of the contract in light of *all* extrinsic evidence?

The first inquiry presents a question of law. The third inquiry presents a question of fact. The thorny problem is classifying the second inquiry as one of law or fact or both. As will be seen we do not resolve this issue because we need not do so.

### Language of the Escalator Provision

█ The district court held without resort to any evidence extrinsic to the contract that the language of the escalator provision after its amendment was ambiguous. We agree with this legal conclusion. The amended price escalator does not mention refunds. Viewed facially, "average cost" is a hollow term into which "average current cost" can be easily poured because it has no internal time dimension. Indeed, a witness called by Distribution Corp. conceded facial ambiguity while arguing that it disappeared in its regulatory environment.

We believe the express contract terms were ambiguous without resort to evidence of custom. Because they were ambiguous as a matter of law, the district court was entitled to consider *all* extrinsic evidence, not only course of dealing, trade usage, and course of performance. It follows that its interpretation of the contract based on extrinsic evidence must then be reviewed under a "clearly erroneous" standard. Regardless, the trial court's underlying fact findings on dealing, usage, and performance were not clearly erroneous and the contract is ambiguous as a matter of law when laid in that context.

### Course of Performance

█ There was little evidence of a course of dealing between the parties or of a usage

of trade.[1] It was nonetheless telling. The trial judge pointed to the fact that Distribution Corp. had disregarded refunds on "four successive Januarys." N.Y.U.C.C. § 2–208(1) provides:

> Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

We agree with his emphasis and reject Distribution Corp.'s argument that its failure to take refunds into account in computing the gas price from the time of the amendment until March 1978 should not have been deemed a course of performance.

New York courts have treated similar behavior as a course of performance and given it weight in contract interpretation. In *Webster's Red Seal v. Gilberton World-Wide,* 67 App.Div.2d 339, 415 N.Y.S.2d 229 (1st Dept.1979), *aff'd for reasons given in opinion below,* 53 N.Y.2d 643, 421 N.E.2d 118, 438 N.Y.S.2d 998 (1981), where a second royalty agreement stated that if the cover price were increased the original agreement would be reinstated, and the parties had operated under the new agreement until 1974 despite a 1970 price increase, the court held:

> We therefore conclude that as a matter of practical construction—or what, as a practical matter, amounts to the same thing, modification of the agreement implied in fact from the course of the conduct of the parties—the proviso about the

increase in cover price was no longer effective by 1970, and that after the $30,-000 had been paid, plaintiff was and is entitled to $200 per issue only.

415 N.Y.S.2d at 231. As the court said in *Hutchins v. Bethel Methodist Home,* 370 F.Supp. 954, 962 (S.D.N.Y.1974) (applying New York law):

> Great weight should be given to a practical construction of the contract by defendant. [Citations omitted.]
>
> When a party gives a contract a practical construction which is patently adverse to said party's economic interests and then fails to deny or explain away such practical construction, this rule is especially applicable.[2]

Although we have not found a New York U.C.C. case involving an alleged course of performance similar to the one here,[3] other courts applying the U.C.C. have upheld contract interpretations based on similar conduct. Thus, in *Nanakuli Paving & Rock Co. v. Shell Oil Co.,* 664 F.2d 772 (9th Cir.1981), the Ninth Circuit affirmed a jury verdict that "price protection" had been incorporated into an agreement between a contractor and Shell for the sale of asphalt, that is, that Shell had agreed not to raise the price on asphalt tonnage that the contractor had already committed to a particular construction project. In so doing, the court held that the jury was entitled to find that two prior instances of price protection were a course of performance that could be relied upon in interpreting the agreement. As the court put it, "The U.C.C. looks to the actual performance of a contract as the best

---

1. Paragon points out that the Uniform System of Accounts for natural gas companies does not have a separate account for cost of gas *net* of refunds. The district court did not rely on this evidence of a purported trade usage, however.

2. *See also Viacom International, Inc. v. Lorimar Productions, Inc.,* 486 F.Supp. 95, 98 n. 3 (S.D.N.Y.1980): "The practical interpretation of a contract by the parties, manifested by their conduct subsequent to its formation for any considerable length of time before it becomes a subject of controversy, is entitled to great, if not controlling weight in the construction of the contract."

3. In *Lubrication & Maintenance, Inc. v. Union Resources Co.,* 522 F.Supp. 1078 (S.D.N.Y. 1981) (applying New York law), the court adopted the defendant's interpretation of a price escalator because the plaintiff had once accepted payment tendered by the defendant. "[T]hat plaintiff did accept without protest the payment based on defendant's interpretation of the escalation clause warrants a finding that it reflected the intent of the parties and was a practical construction of the clause." *Id.* at 1081. A single occasion, however, does not a course of performance make. *See* N.Y.U.C.C. § 2–208, Official Comment 4.

indication of what the parties intended those terms to mean." *Id.* at 778.

Distribution Corp. argues that its pre– 1978 conduct amounted to only a waiver. N.Y.U.C.C. § 2–209(5) provides:

A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

In addition, Official Comment 3 to § 2–208 provides:

Where it is difficult to determine whether a particular act merely sheds light on the meaning of the agreement or represents a waiver of a term of the agreement, the preference is in favor of 'waiver' whenever such construction, plus the application of the provisions on reinstatement of rights (see Section 2–209), is needed to preserve the flexible character of commercial contracts and to prevent surprise or other hardship.

Distribution Corp. contends that no course of performance was established because it had not "focused" on the necessity of taking refunds into account before receipt of the $16 million Tennessee Gas Pipeline refund. It argues that the 1976 and 1977 escalator calculations were only mechanical applications of the 1975 method. The legal standard for course of performance, according to Distribution Corp., is whether the acts were performed (1) by a responsible agent, (2) who has recognized the existence of alternative interpretations and (3) has consciously selected one among alternative interpretations (4) in the belief that such interpretation was contractually required. As support for its proposed four-part test, Distribution Corp. cites a Minnesota case, *Security Mutual Casualty Co. v. Luthi,* 303 Minn. 161, 226 N.W.2d 878 (1975), in which the court asserted, "[T]o imply meaning from conduct, the acting party must have placed some significance on his conduct in relation to the contract term." *Id.* at 883. *Security Mutual Casualty* is not a Code

case, however; it was concerned with the interpretation of an insurance contract.

■ The trial judge did not proceed in such a four-part sequence but concluded, "[O]nly to the extent that performance explains the intent of the parties . . . should it be used." This was the proper legal standard, *see* § 2–208, Official Comment 1 ("The parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that agreement was"), and the trial judge's application of this standard to Distribution's pre-1978 conduct was a finding of fact reversible only if clearly erroneous. *See Nanakuli Paving & Rock Co. v. Shell Oil Co.,* 664 F.2d at 794.

### Other Extrinsic Evidence

The district court did not base its conclusion that "average cost of gas" excluded refunds only on course of performance. First, it pointed to Fox's letter accompanying the 1975 amendment which stated, "Amounts subject to refund (unadjudicated rates) were not deducted from this calculation, a method which will always be to the benefit of the producer, because of the complexity of the calculation." Second, the district court noted that Distribution Corp. had employed a different method of deduction every year since it began taking refunds into account. Third, it emphasized the commercial context at the time of the amendment: supplies of natural gas were scarce, intrastate gas producers were renegotiating their sales contracts, and Distribution Corp. was anxious to insure an adequate supply of locally produced gas.

■ All of these findings were sufficiently supported by evidence and were evaluated by the district court under the proper legal standard. The prevailing rule is that "the court can look to the surrounding facts and circumstance *to determine the intent of the parties."* *67 Wall Street Co. v. Franklin National Bank,* 37 N.Y.2d 245, 371 N.Y.S.2d 915, 917, 333 N.E.2d 184, 186 (1975) (emphasis added). "[I]f the District Judge rules that the agreement in question is ambigu-

ous, incomplete, or uncertain in any respects parol evidence of *the intent and purposes of the parties* in making the contract becomes admissible." *Chase Manhattan Bank v. First Marion Bank*, 437 F.2d at 1046 (emphasis added). The trial court applied "intent of the parties," the governing legal standard, treating Distribution Corp.'s statements and post-1975 amendment conduct and the 1975 commercial context as aids in discerning that intent in February 1975.

### The District Court's Interpretation

The only remaining question is whether the trial court's finding that the parties did not intend refunds to be taken into account in computing average costs of gas was clearly erroneous. We conclude that it was not.

The letter accompanying the 1975 amendment indicated that the old price escalator was being dropped because of "the complexity of the calculation." Yet including refunds in the escalator would have made the new escalator *more* complex than the old one. While using only finally adjudicated rates may result in a tedious computation, there is no allocation problem.

When Distribution Corp. did decide to deduct it was uncertain of its method of calculation. This uncertainty is inconsistent with its claim at trial that it all along intended to make the calculation. As observed by the district court, it ought not to have taken Distribution Corp. from 1978 to 1981 to decide on a method of calculation had it intended from the beginning to make such a calculation.

Finally, Distribution Corp.'s failure to take refunds into account during the first three years of operating under the new escalator allows an inference that refunds were not intended to be taken into account. The schedule of gas costs attached to the 1975 letter amendment did not mention refunds. Nor did Distribution Corp. do anything about refunds in 1976 or 1977. In fact, not until approximately five months had elapsed from the receipt of the Tennessee Gas Pipeline refund did Distribution Corp. take any action at all.

Distribution Corp. offers little in the way of evidence in support of its interpretation of the amended price escalator. Rather, it objects to the district court's interpretation on grounds of commercial unreasonableness. Distribution Corp. argues that it could never have intended to enter into an agreement requiring it to commit "economic suicide," to "sacrifice its financial viability upon the altar of local production stimulation." Distribution Corp.'s position is that it would not have incurred gas purchasing costs that it could not have passed along to its customers. This argument, however, falls of its own weight. First, gas purchases from Paragon and other local producers represented only a small percentage of Distribution Corp.'s gas supply. The danger to Distribution Corp.'s financial stability even assuming the NYPSC did forbid passing along all of the costs from the agreement with Paragon was not great either in 1975 or at the time of trial. Second, the NYPSC did not prevent Distribution Corp. from passing along its costs to its customers during the three years that it failed to take refunds into account. Third, even Distribution Corp.'s interpretation of the escalator provision leaves open the possibility that the price paid Paragon would outrun the interstate price and therefore cost recovery would be denied. As Paragon has noted, one can hypothesize a three-year sequence in which the average cost of gas purchased from the three pipelines goes up, then down, then up again. (Assume there are no refunds received or allocated to this time span.) The result under the price escalator would be that the price paid Paragon would first increase by the amount of the first year's increase, then increase by $0.02 per MCF, then increase by the amount that the third-year price exceeded the second-year price.

In sum, we agree with the district court's holding that the language of the amended escalator provision was ambiguous and with its interpretation of the contract. It follows that we cannot conclude that its interpretation of that provision based on sur-

rounding facts and circumstances was clearly erroneous. The judgment of the district court is therefore AFFIRMED.