**PARAGON RESOURCES, INC., Plaintiff-Appellee,**

**v.**

**NATIONAL FUEL GAS DISTRIBUTION CORPORATION, Defendant-Appellant.**

**No. 82-4424.**

United States Court of Appeals, Fifth Circuit.

Jan. 23, 1984.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., Heino H. Prahl, Cook, Yancey, King & Galloway, F. Drake Lee, Jr., Shreveport, La., for defendant-appellant.

Blanchard, Walker, O'Quin & Roberts, Shreveport, La., William Timothy Allen, III, Kavinoky, Cook, Sandler, Gardner, Wisbaum & Lipman, Allan R. Lipman, Buffalo, N.Y., for plaintiff-appellee.

Before REAVLEY, RANDALL, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In this Louisiana diversity case defendant National Fuel Gas Distribution Corporation, a public utility operating in Western New

York, appeals from a declaratory judgment in favor of plaintiff Paragon Resources, Inc., a gas production company with wells drilled in Chautauqua County, New York. The district court construed Paragon's waiver of its "take or pay" rights in a natural gas production contract to be temporary rather than permanent after considering extrinsic evidence, including declarations of subjective intent. We remand, explaining that under the U.C.C. evidence of subjective intent is not to be considered in an attempt to clarify evidence of course of dealing, usage of trade, or course of performance, absent a finding of ambiguity after looking at such Code evidence.

## I

As of July 1, 1974, Paragon, as seller, and Distribution Corp.'s predecessor, as buyer, entered into a gas purchase agreement. The GPA contained the following provision, known as a "take or pay" obligation:

> Commencing with the initial delivery of gas from each particular well hereunder and subject to the other provisions of this agreement, Seller agrees to sell and deliver to Buyer, and Buyer agrees to purchase and receive, or pay for if available and not taken, an average daily quantity of gas ... from each of Seller's wells [equal to one hundred percent (100%) of the delivery capacity of Seller's wells] ... [d]uring the period each year beginning November 1 through the following April 30 ... [and] [d]uring the period each year beginning May 1 through the following October 31 ... whatever quantity of gas Seller desires to deliver up to fifty percent (50%) of the volume delivered during the preceding six-month period....

Under this provision Distribution Corporation was obligated to pay for certain gas at its then current price which was available but which it did not take. But, when Distribution Corporation finally recouped the gas, it received the gas free of any additional charge despite any increase in purchase price.

Paragon developed the acreage devoted to the GPA through syndicating limited partnerships of which it was the general partner-operator. Paragon, a new company at the time of the GPA, then financed its participation in the drilling program in part through loans from General Electric Credit Corporation. These loans were secured by Paragon's individual interest in the leases assigned by it to the limited partnerships and the production attributable to its individual interests. By mid-1975, Paragon owed GECC approximately $1.9 million and sought $6 million more. GECC agreed to a loan of an additional $6 million, but this time insisted on a guarantor.

Paragon turned to its buyer, Distribution Corporation, a natural beneficiary of any increased production due to the $6 million loan, and through payments to Paragon in effect the source of Paragon's ability to repay the loan. After negotiations Distribution Corporation agreed to be the ultimate guarantor of the $6 million loan, and entered into the now disputed agreement, the National Fuel Gas Distribution agreement.

Two provisions of the NFGD agreement are significant here. First, under the GPA Paragon could terminate at any time after July 1, 1977. The new GECC loan was not scheduled to be paid before July 1, 1977. Distribution Corporation naturally wanted Paragon to give up its termination right so that Distribution Corporation would not be at risk on the guarantee without the corresponding benefit of receiving Paragon's increased gas production. Second, the GPA's take or pay mechanism was waived—temporarily according to Paragon, and permanently according to Distribution Corp. In addition, at the insistence of GECC a substitute take or pay mechanism was agreed to whereby Distribution Corporation agreed to pay Paragon enough to equal net revenues of $1.3 million a year for available gas until Paragon's already outstanding $1.9 million debt was paid, at which point Distribution Corporation's guarantee of the further $6 million debt would become effective. The parties further made clear that Distribution Corporation had the right to recoup gas

paid for but not taken under the substitute take or pay agreement after other substitute take or pay obligations ceased when the $1.9 million debt was paid. The relevant portions of the NFGD agreement read:

> 1. Until such time as either (i) National is finally released and discharged from its obligations to GECC as guarantor pursuant to the Guarantee Agreement (other than upon performance by National of such obligations in accordance with the terms of the Guarantee Agreement, which performance is deemed to include, but not by way of limitation, the exercise of National's options pursuant to paragraphs b, c or d of Section 1.2 of the Guarantee Agreement) or (ii) Paragon has satisfied all of its obligations to GECC, its successors or assigns, under or pursuant to the Consolidated Loan Agreement and each document identified therein or delivered by Paragon in connection therewith, whichever event shall first occur,
>
> (a) . . .
>
> (b) Paragon hereby surrenders and waives any and all right or power which it may have under part XIII: "*Term*" of the [GPA] to cancel the [GPA];
>
> (c) . . .
>
> (d) . . .
>
> (e) . . .
>
> 2. Paragon hereby surrenders and waives, with respect to all wells which are or may hereafter become subject to the [GPA], any and all of its rights to enforce provisions of the [GPA] contained in Paragraphs V(a), V(b) and V(c) thereof which require NFGD to pay for gas available but not received or taken. Paragon further undertakes to permit NFGD to honor its obligations to GECC contained in the letter, the form of which is attached hereto as Exhibit "B," by accepting payment for amounts of gas paid for but not taken thereunder, [insofar as necessary to permit Paragon to achieve net revenues equal to $1.3 million], and if NFGD pays for gas not received under the obligations described in Exhibit "B" hereto, then at such time as (a) National is discharged from all of its obligations as obligor pursuant to the Guarantee Agreement or (b) the principal amount of indebtedness outstanding under the Consolidated Note is reduced to an amount no greater than $6,000,000, whichever event occurs first, all deliveries of gas by Paragon to NFGD under the [GPA] will be made without payment until such time as these deliveries are equal in volume to the volumes paid for but not received pursuant to NFGD's obligations to GECC described in Exhibit "B" hereto.

In December of 1978, Paragon filed this action for a declaratory judgment that the waiver of take or pay was not permanent, but, rather, coterminous with the time Distribution Corporation remained liable on its guarantee. The case was consolidated for trial with a case which we have now decided, *Paragon Resources v. Nat. Fuel Gas Distribution,* 695 F.2d 991 (5th Cir.1983) (*Paragon* I). After a bench trial and after considering extrinsic evidence, including evidence of subjective intent, the district court held the waiver was temporary.

## II

The parties have stipulated that New York law governs our decision. New York has adopted the U.C.C. Unlike the *Paragon* I case in which the trial court made a specific finding that the escalator provision in question there was facially ambiguous, here the district court made no specific finding of ambiguity as to the waiver clause to support the consideration of subjective intent evidence. Rather, after citing the Code principle of construing a contract in light of its surrounding circumstances, including course of dealing and trade usage, the trial court stated that the declarations of intent offered by the plaintiff were admissible, for "the declarations of intent are not used to interpret the actual words contained in the contract but rather to achieve an understanding of the commercial setting surrounding the contract." Applying this principle the trial court determined that in

light of the contract's commercial setting, as illuminated by declarations of subjective intent, the contract provided only for a temporary waiver.

The trial court erred in considering evidence of subjective intent in determining the commercial context of the agreement. We remand for treatment of the case in light of the principles outlined in *Paragon* I. Briefly, evidence of subjective intent is not to be considered in addition to evidence of course of dealing, trade usage, or course of performance unless the court finds the contract ambiguous after looking at such Code evidence. *See Paragon* I, 695 F.2d at 965–66. Although the Code has to a degree expanded admission of some types of extrinsic evidence in comparison to pre-Code principles, the interpretation of a contract is not so free-wheeling an inquiry as to allow all types of relevant evidence to be considered absent special circumstances. Instead the demand of commerce for predictability in the affairs of merchants is best served by the more disciplined and sequential inquiry we described in *Paragon* I. This as we read it is the command of the U.C.C. as interpreted by the New York courts.

While from our view it is difficult to find that the otherwise explicit contract is in fact ambiguous when placed in context, we think it unwise to decide that question on the voluminous, cold record before us and we decline to do so. We therefore remand the case for proceedings consistent with the principles outlined in *Paragon* I.

REMANDED.