**TRI–STATE PETROLEUM CORPORATION, Plaintiff-Appellant,**

v.

**SABER ENERGY, INC. d/b/a Saber Refining Co., Defendant-Appellee.**

No. 87–2705.

United States Court of Appeals, Fifth Circuit.

May 24, 1988.

---

6. *Id.*, 782 F.2d at 1301.

7. *Id.* at 1301 n. 2.

8. 563 F.2d 956, 958 (9th Cir.1977).

9. *Umanzor*, 782 F.2d at 1301.

 

leum to buy gasoline from Saber Refining. Tri-State asserts that it successfully incorporated a clause in the contract that allowed it to cancel the agreement. The magistrate [1] held, however, that the clause never became part of the contract. Tri-State also asserts that the magistrate erred in calculating Saber's damages because of Tri-State's breach of the contract, and in refusing to award attorneys' fees to Tri-State. We affirm the magistrate's decision on Tri-State's liability under the contract and on the amount of Saber's damages. We reverse the magistrate's failure to award attorneys' fees to Tri-State, and remand for a calculation of the amount of the fees.

### I.

Because of an agreement with Texaco, Tri-State Petroleum in 1981 needed to secure delivery of gasoline into the Colonial Pipeline in Pasadena, Texas. In accord with custom in the industry, Tri-State arranged for Lawrence Dorr, an independent broker, to locate a source for the gasoline and to negotiate a contract. Dorr arranged an agreement between Tri-State and Saber Refining. Dorr sent telex messages confirming the agreement's negotiated terms, such as price, place of delivery, date of delivery, and quantity, to both parties. The telex messages called for Saber to deliver 110,000 barrels of gasoline into the pipeline per month from July 1981 to December 1981.

After receiving the telex message, Saber prepared a formal contract expressing the agreement of the parties. The contract incorporated the terms of the telex messages, but also contained several standard provisions. One provision was that "Except as otherwise provided on the face hereof, buyer may not cancel this Agreement under any circumstances without Saber's express written consent." Another provision conditioned the contract on "Buyers Acceptance of the terms and conditions expressed in this Agreement, additional or

John E. Rapier, Dallas, Tex., for plaintiff-appellant.

Thomas M. Farrell, Gerald L. Bracht, Houston, Tex., for defendant-appellee.

Before THORNBERRY, WILLIAMS, and DAVIS, Circuit Judges.

THORNBERRY, Circuit Judge:

This appeal concerns the interpretation of a contract that required Tri-State Petro-

---

**1.** This case was tried by the consent of all parties before a U.S. magistrate. *See* 28 U.S.C. § 636(c).

conflicting terms proposed by Buyer are rejected." Saber signed its draft and sent it to Dorr, who forwarded it to Tri-State.

When Tri-State received the agreement, Donald Book, Tri-State's general manager, had a cancellation clause typed on the first page. The clause gave Tri-State the right to cancel the contract if Texaco ever canceled its agreement with Tri-State. The district court found that Book, as well as Edward Coyne, Tri-State's president, at the time thought that Saber had orally agreed to the cancellation term. But the court also found that neither Book nor Coyne had participated in any discussions with Saber. The district court found that the only Tri-State employee to negotiate with Dorr and Saber was James Peyton. Neither party, however, offered any testimony by Peyton.

Book signed the modified contract for Tri-State and forwarded it, along with a cover letter, to Dorr. The letter told Dorr that Tri-State had added the cancellation provision pursuant to an oral agreement with Saber. Dorr forwarded the modified contract to Saber, but the district court found that he neglected to forward Book's cover letter explaining the change in the contract. Saber did not notify Tri-State of any objection to the new cancellation clause.

The gasoline purchase for July 1981 was without dispute. In August, however, Tri-State told Saber that Texaco had canceled its agreement with Tri-State, and that therefore Tri-State would exercise its option to cancel the Saber contract. Saber objected and set off its claim against an amount that Saber owed Tri-State under another, unrelated contract. When Tri-State sued under the unrelated contract, Saber filed a counterclaim seeking damages for Tri-State's failure to honor the gasoline purchase contract.

After an initial dispute over whether Tri-State had properly named Saber as a defendant, Saber conceded its liability on the unrelated contract, and the district court granted Tri-State partial summary judgment. The parties agreed to try Saber's counterclaim before a magistrate. The magistrate held that the cancellation clause never became a part of the contract. As a result, Tri-State had breached the agreement when it attempted to cancel. The magistrate awarded Saber, as a "lost volume seller" and "jobber," damages for lost profit. She also awarded Saber, as the prevailing party in the litigation, its attorneys' fees. But she denied Tri-State's claim for its attorneys' fees in winning the partial summary judgment on the unrelated contract.

## II.

■ Tri-State first argues that the magistrate erred in concluding that the cancellation clause never became part of the contract. The magistrate's holding was based on the view that this dispute is governed by Tex.Bus. & Comm.Code Ann. § 2.207 (Tex. UCC).

(a) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(b) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(1) the offer expressly limits acceptance to the terms of the offer;

(2) they materially alter it; or

(3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

The magistrate concluded that Saber's sending the contract to Tri-State was an offer. By signing the contract and returning it to Saber, Tri-State accepted Saber's offer, even though Tri-State added an "additional or different term"—the cancellation clause—to the contract. *See* Tex. UCC § 2.207(a). That term did not become part of the contract, the magistrate concluded, because all three of subsection (b)'s requirements had been met: Saber's offer

limited acceptance to the express terms of the offer; adding a cancellation term materially altered the contract; and Saber had already given notice to Tri-State of its objection to the additional term.

Tri-State contests the magistrate's conclusion that section 2.207 governs the dispute. Its argument is in essence that Saber had agreed orally to the insertion of the cancellation clause. Therefore, Tri-State's insertion of the cancellation term in the contract, and its sending of the letter to Dorr explaining its reason for inserting the term, operated as mere written confirmations of the oral agreement. As a result, Tri-State claims, not section 2.207 but section 2.201(b) governs this case:

> (b) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of Subsection (a) against such party unless written notice of objection to its contents is given within ten days after it is received.

It is unquestioned that Saber failed to make any objection to Tri-State's cancellation term within ten days of receipt, and Tri-State therefore argues that, as a matter of law, the cancellation clause became a part of the contract in accordance with the terms of section 2.201(b).

We reject Tri-State's argument concerning section 2.201. That section is merely the UCC's statute of frauds. Subsection (b) provides an exception to the normal rule that a writing must be signed by the party against whom enforcement is sought. Section 2.201 does not apply in the present case because neither party is asserting that any oral contract is invalid because of the statute of frauds. As Comment 3 to section 2.201 makes clear, the only result of failing to object within ten days as required by subsection (b) "is to take away from the party who fails to answer the defense of the Statute of Frauds; the burden of persuading the trier of fact that a contract was in fact made orally prior to the written confirmation is unaffected."

This issue was squarely addressed in *Hurricane Steel Industries v. Maurice Pincoffs Co.*, 464 S.W.2d 387 (Tex.Civ.App. —Houston [14th Dist.] 1971, no writ). In *Hurricane*, the seller contended, as does Tri-State in the present case, that the buyer's failure to object under subsection (b) made it bound by the terms of a written confirmation letter sent by the seller. The court commented that the "failure to object to [the letter] in writing within ten days would not make [the buyer] bound by its language. The only effect ... was to constitute the letter a compliance with the statute of frauds requirement of Subsection (a)." *Id.* at 389.

 A deeper problem than Tri-State's mistaken reliance on section 2.201 is its failure at trial to prove that Saber orally agreed to the insertion of the cancellation clause. The magistrate did find that Book and Coyne, Tri-State executives, believed that Saber had agreed to the clause. But the magistrate also found that Peyton, alone among Tri-State employees, took part in negotiations with Dorr and Saber. In particular, the magistrate held that "[t]estimony that Coyne or Book overheard or participated in these conversations is ambiguous and unreliable." With no credible evidence that Book or Coyne had any direct knowledge of what Saber did, their belief about Saber's position is naturally no evidence of what Saber agreed to. Because Peyton did not testify, the magistrate's findings compel the conclusion that there was no credible evidence that Saber ever agreed to the cancellation clause.

Tri-State attacks the magistrate's finding that Book's and Coyne's testimony was "ambiguous and unreliable." Tri-State argues that this statement "is a comment on the weight of the evidence and not a finding." We disagree. Decisions on the credibility and weight of testimony are integral parts of findings of fact. *See* Fed.R.Civ.P. 52(a) ("Findings of fact ... shall not be set aside unless clearly erroneous, and *due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.*") (emphasis added); *cf. Anderson v. City of Bessemer City*, 470

U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings...."). Furthermore, even though some of the testimony discounted by the magistrate is from depositions, the clearly erroneous standard nonetheless applies. *See id.* 105 S.Ct. at 1511–12 (holding that the standard applies "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts"). Our review of the record disclosed no reason to think the finding clearly erroneous, and we therefore reject Tri-State's argument.

Although the magistrate's findings compel the conclusion that there was no credible evidence that Saber agreed to the cancellation clause, Tri-State argues that Saber had the burden to obtain an "affirmative defensive finding" that no agreement existed. Presumably, Tri-State is arguing that Saber is guilty of a procedural default in failing to obtain an explicit ruling on this issue, and, as a result, the appeals court should decide the issue against it. Tri-State, however, cites no authority for this proposition and its argument contradicts the general federal rule that the only findings required are those sufficient for a "clear understanding of the basis of the decision." 9 C. Wright & A. Miller, Federal Practice and Procedure, § 2577, at 697 (1971). In this case, we think the magistrate's findings are sufficient for an understanding of the basis of decision.

### III.

■ Tri-State next argues that the magistrate erred in awarding Saber its lost profits as a result of Tri-State's breach. First, Tri-State argues that no lost profits should have been awarded because Saber was not a "lost volume seller." Second, it argues that the magistrate failed to include in the calculation of Saber's lost profits some of the costs that Saber avoided by Tri-State's breach.

The general measure of damages for the seller because of the buyer's breach is provided by UCC § 2.708(a): the difference between the market price at the time of tender and the unpaid contract price. But section 2.708(b) provides that when subsection (a)'s measure is insufficient "to put the seller in as good a position as performance would have done," then the seller may recover his lost profit. Subsection (b)'s measure of damages is appropriate when

> the purchaser at resale would have been solicited by the seller had there been no breach, the solicitation would have been successful, and the seller could have performed the additional contract. The reason for the rule is based on the idea that the lost volume seller would have received two profits, not just one....

*Malone v. Carl Kisabeth Co.*, 726 S.W.2d 188, 190 (Tex.App.—Fort Worth 1987, no writ). Similar to a lost volume seller is a "jobber," a reseller who, because of the buyer's breach, never obtains the goods from his supplier. *Nobs Chemical, U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212, 215 (5th Cir.1980). A jobber is also entitled to lost profit damages from a breaching buyer. *Id.*

■ The magistrate concluded that Saber was a lost volume seller for the gasoline that Tri-State should have bought in August. This gasoline had already been purchased by Saber, and Saber was able to sell it to other buyers. The magistrate also held that Saber was a "jobber" for the September gasoline, which Saber never bought because of Tri-State's breach.

Tri-State's main attack on the magistrate's findings is to argue that a "seller's market" in gasoline existed at the time of Saber's purchases. In a seller's market, there is insufficient gasoline available for buyers at the price that buyers wish to pay. Such a market would make lost volume or jobber status less likely because Saber, which did not produce gasoline but only bought it for resale, would have found it more difficult to obtain product.

There is no doubt that evidence of the status of the market for gasoline would have been relevant, although not necessar-

ily conclusive, to the court's determination that Saber was a lost volume seller. But Tri-State chose not to introduce such evidence. The only evidence before the magistrate was Hofer's testimony that Saber could have located sufficient gasoline to supply both Tri-State and the customers to whom Tri-State's gasoline was resold. Under those circumstances, Tri-State cannot legitimately fault the magistrate's decision to credit Hofer's testimony and award Saber damages as a lost volume seller.

■ Tri-State also claims that the magistrate erred in failing to credit it with certain costs that Saber avoided because of the breach. First, Tri-State points to the commission of Dorr, the broker for the sale. His commission for the unconsummated August and September purchases would have been $9,900. Tri-State argues that Saber saved this expense because of the breach. Tri-State also notes that "we have no idea" what other administrative expenses that Saber might have saved because it did not have to purchase and ship gasoline to Tri-State.

Tri-State's argument is without merit. As an initial matter, it appears that Tri-State never objected to the calculation of damages. As a result, it waived any complaint. *Pickle v. International Oilfield Divers, Inc.*, 791 F.2d 1237, 1241 (5th Cir. 1986). But in any case, because Tri-State introduced no evidence on damages and failed even to cross-examine Saber's witnesses on the subject of damages, the magistrate was justified in crediting Saber's evidence on damages.

For example, Tri-State did not introduce any evidence that Dorr planned to forgo his commission on the unsold August and September gasoline. Thus, the magistrate was entitled to conclude that this expense was not "saved" as a result of the breach. In addition, while Hofer acknowledged that Saber incurred some "administrative costs" in supplying the gasoline to Tri-State, the magistrate could have interpreted this reference as overhead, which Saber would not save as a result of the breach. In any case, Tri-State introduced no evidence that

compelled the magistrate to reach a different conclusion.

IV.

■ Tri-State's last argument on appeal is that the magistrate erred in failing to award attorneys' fees for its successful prosecution of the contract that was the subject of its principal claim. Both that contract and the contract that was the subject of Saber's counterclaim contained the following paragraph:

E. If either party hereto institutes litigation concerning this Agreement against the other party and such litigation is ultimately resolved through adjudication in a court of law, the prevailing party shall be entitled to reimbursement from the other party for reasonable attorneys fees ... as a result of such litigation.

The district court before trial entered an uncontested partial summary judgment for Tri-State on its principal claim. The magistrate later awarded Saber judgment on its counterclaim and attorneys' fees for its counterclaim. The magistrate also found that Tri-State incurred "reasonable and necessary attorneys' fees in prosecuting its principal claim against Saber in the sum of $14,737.50." But the final judgment awarded a net amount to Saber that failed to include Tri-State's attorneys' fees in the calculation. The magistrate did not explain her decision to deny Tri-State's attorneys' fees.

Saber argues that the decision to deny Tri-State its attorneys' fees under the contract was justified because Tri-State was not the "prevailing party" in the entire litigation in view of the net judgment entered against Tri-State. Saber also argues that the contract in the principal claim gave it the right to withhold sums from Tri-State to set off any amount that Tri-State might owe Saber under other contracts. In any case, Saber argues, Tri-State cannot show that the magistrate's decision was clearly erroneous.

We disagree with Saber about the standard of review. The interpretation of a contract is a question of law and the appel-

late court is not bound by the clearly erroneous standard of review unless ambiguities require the court to consult extrinsic evidence. *Paragon Resources, Inc. v. National Fuel Gas Distribution Corp.*, 695 F.2d 991, 995 (5th Cir.1983). If extrinsic evidence is necessary to the interpretation, of course, then the court of appeals is required to accept facts found by the district court unless they are clearly erroneous. *See id.* We think, however, that no extrinsic evidence is required to interpret this contract.

 The best interpretation of these contracts is that each unambiguously awards attorneys' fees to the party that prevails on each. Although Saber is correct in noting its set-off rights under the contract that formed the basis of Tri-State's principal claim, its linkage of those rights to Tri-State's right to obtain attorneys' fees is tenuous. Despite the set-off rights, Tri-State had to institute litigation to collect an amount rightfully due it under the principal contract, and that seems to us sufficient under the language of the contract to allow it to recover its attorneys' fees. As a result, while Saber properly was awarded attorneys' fees on its counterclaim, Tri-State also should have been awarded attorneys' fees on its principal claim.

We are troubled, however, by the amount of Tri-State's attorneys' fees. The magistrate held that Tri-State incurred $14,737.50 as reasonable attorneys' fees. But nothing in the record explains the magistrate's reasoning in arriving at this figure. In addition, the amount appears excessive in view of the fact that Saber conceded its liability on Tri-State's principal claim; most of the litigation in this case concerned Saber's counterclaim. To resolve these difficulties, we remand to the district court for a new and more complete determination of the amount of Tri-State's attorneys' fees, in accordance with *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974) (setting forth the factors that courts are to use in this circuit in determining an award of reasonable attorneys' fees).

## V.

For the above reasons, we AFFIRM the magistrate's decision except insofar as it failed to award attorneys' fees to Tri-State for the prosecution of its principal claim, and REMAND to the district court for a new determination of the amount of the fees.