**MIDLAND INSURANCE COMPANY, Intervening Plaintiff and Mildred Prioleau, Administratrix of the Estate of John Prioleau, Plaintiff,**

v.

**DELTA LINES, INC. and Strick Corporation, Defendants.**

Civ. A. No. 79–1950–1.

United States District Court,
D. South Carolina,
Charleston Division.

Jan. 19, 1982.

Grover C. Seaton, III, and Hans F. Paul, Charleston, S.C., for plaintiff.

John W. Minor, Hilton Head Island, S.C., and Edward T. Brennan, and Richard A. Rominger, Savannah, Ga., for intervening plaintiff.

Pledger M. Bishop, Jr., Charleston, S.C., for defendant Delta Lines, Inc.

Marvin D. Infinger, and Charles H. Gibbs, Charleston, S.C., for defendant Strick Corp.

## ORDER

HAWKINS, District Judge.

This action brought in this court's diversity jurisdiction is before the court on amended complaint filed November 3, 1980. The suit arises out of the death of plaintiff's intestate while participating in the shifting of a cargo container on the deck of the SS DELTA ECUADOR, a vessel owned by defendant Delta Lines, Inc. (Delta). At the time of his death, plaintiff's intestate was employed by Southeastern Maritime Company, the stevedore engaged to work the ship.

The amended complaint asserts claims sounding in strict tort liability and negligence against defendants, alleging that the container was defectively manufactured, designed and maintained. Delta answered and crossclaimed against Strick Corporation alleging that Strick, as manufacturer, was responsible for any damages resulting from the defective nature of the container. Strick counterclaimed to the cross claim, alleging a contractual indemnity agreement between it and Delta. The present motion is for summary judgment as to the cross claim and counterclaim. Strick seeks an order placing responsibility on Delta Lines for the defense of the suit and for payment of any judgment which might be rendered against Strick Corporation as a result of the action. For the reasons stated below the motion is granted.

As is evidenced by an equipment lease agreement dated September 17, 1976, Strick Corporation owned the container, # PLIU–203274–6, allegedly responsible for the

death of plaintiff's intestate, and leased the same to Prudential Lines. It further appears that defendant Delta was the sublessee of Prudential Lines and assumed the terms and conditions under the lease agreement. Delta has admitted the authenticity of the lease and sublease agreements in response to requests for admission.[1]

■ Two provisions contained in the lease agreement, assumed by Delta, establish its indemnity obligation to Strick. Paragraph ten of that document reads in part as follows:

[L]essee hereby specifically indemnifies lessor, and agrees to hold lessor harmless, against all loss and damages lessor may sustain or suffer because of . . . (c) the death of, injury to, and damages to the property of, any person as a result of, in whole or in part, the use or maintenance of the equipment of any thereof while in the custody, possession or control of lessee or anyone claiming by, through or under lessee.

Paragraph eleven contains in part the following language: "Lessee further agrees to procure, at lessee's sole cost and expense . . . policies of insurance . . . insuring the lessee against . . . the hazards specified in (c) above [indemnity due to death or injury] . . . ."

The answer of Delta and the deposition testimony of Robert Stephen Marvin of the Charleston Masters, Mates & Pilots Association establish that plaintiff's intestate was killed as the result of the use of the equipment while in the custody, possession or control of Delta as described in paragraph ten of the lease.

Delta's answer admits the allegation of paragraph four of the amended complaint that the SS DELTA ECUADOR was owned by Delta and that the container in question was "owned and maintained" by Delta at the time of the accident.

Mr. Marvin's testimony indicates that he was present on the SS DELTA ECUADOR on the date of the accident which caused plaintiff's intestate death (Page 6, lines 21 through 25, Page 7, lines 1 through 5); and that the container which is the subject of the complaint was being moved or shifted from an outboard position inboard onto the hatch of the vessel to allow further loading of the vessel. (Page 14, lines 12 through 21).

It is therefore uncontroverted that the subject container was in use and under the "custody, possession, or control" of Delta at the time of the accident, being moved on the deck of its ship in order to allow further loading of the vessel.

Although there is a general reluctance by the courts to construe indemnity provisions so as to cover the fault of the indemnitee [Strick], the clear language used in paragraph ten and Delta's agreement to procure insurance to cover liability for the death or bodily injury described in paragraph ten compel the court to conclude as a matter of law that the defense of the action and payment of any judgment rendered against Strick Corporation is the responsibility of Delta.

First, the language in paragraph ten standing alone, supports this conclusion. In *Southern Railway v. Springs Mills, Inc.*, 625 F.2d 496 (4th Cir. 1980), the Fourth Circuit Court of Appeals was called upon to construe the effect of an indemnity agreement in a personal injury context where the indemnitee's negligence was solely responsible for the injury to plaintiff. There the railway and Springs Mills had entered into an agreement for construction and maintenance of a private track servicing the Mills' plants. Springs Mills agreed to provide minimum clearance on either side of the track. The agreement was supplemented to include an indemnity agreement whereby Springs Mills undertook to "indemnify and save harmless the railway company from and against the consequences of any loss of life, personal injury, or property loss or damage which may be caused by, result

---

1. # PLIU–203274–6 is described in the lease agreement which has been authenticated by requests for admission.

from, or arise by reason of or in connection with, any limited or restricted clearances for said industrial track."

A brakeman for the railway was injured when a gate allowing entry into the Springs Mills yard knocked him from the train, causing him to fall under it and crushing his foot. The cause of the injury was a failure on the part of another railway employee to secure the gate, absolving Mills from any direct responsibility.[2] It was argued that because no specific reference was made to indemnification against injury caused by the railway's own negligence, the indemnity provision should not inure to its benefit.

The court noted that the indemnity language referred to "any loss of life, personal injury ... which may be caused by, result from, or arise by reason of or in connection with, any limited or restricted clearances"; it was held that the language "obviously described a type of loss which could arise from the negligence of the railway as well as that of Springs Mills. Yet the parties agreed that Springs Mills would indemnify against any such loss ...." The lower court judgment of indemnity was affirmed.

The language contained in paragraph ten covering "*all loss* lessor [Strick] may sustain or suffer because of ... death ... as a result of, in whole or in part, the use ... of the equipment ... while in the custody, possession or control of lessee ...," is more specific and clearer than the language construed in *Springs Mills. See also Bentley v. Palmer House Co.,* 332 F.2d 107 (7th Cir. 1964) and *Jacksonville Terminal Co. v. Railway Express Agency,* 296 F.2d 256 (5th Cir. 1961) (construing language similar to that in paragraph ten as creating an indemnity obligation for injury caused by the fault of the indemnitee).

Delta maintains that the indemnity clause here should be treated differently than the clause in *Springs Mills* because the claims triggering the indemnity provision are based on notions of products liability.[3] First, the issue before the court is one of contract construction. The theory triggering the indemnity contract has no effect on whether the language of that agreement is ambiguous or not. Second, the requirement of insurance procurement by Delta to cover indemnity arising out of death or injury described in paragraph ten effectively guts any policy argument which might be made where the underlying claim is based on products liability notions.

If one can create any doubt as to the effect of the language in paragraph ten, the requirement of insurance procurement by Delta as required by paragraph eleven conclusively establishes that it must indemnify Strick Corporation for death or injury resulting from any defect which might be established due to Strick's manufacture or design of the container in question.

Delta's position is that the indemnity agreement does not cover defects for which Strick could be held liable on theories of strict tort liability or negligence, but only for those delicts for which Delta could be held responsible, presumably alteration of the containers, lack of maintenance, etc., which caused the failure of the container. If such were the case, the provision providing for insurance would be superfluous for Strick cannot be held responsible for delicts such as alteration by Delta;[4] *and Strick could have no conceivable interest in forcing Delta to insure itself against claims for which Strick could not be liable.* The only conclusion which can be reached, as is borne out by the clear language of the indemnity and the procurement of insurance agreement, is that the indemnity agreement here is a conscious risk-shifting device by which

**2.** There was a slight violation of clearance of the fence post on which the gate was attached, but it did not contribute to the injury.

**3.** Cases cited by Delta are distinguishable in any event. *See,* e.g., *Rourke v. Garza,* 511 S.W.2d 331 (Tex.Civ.App.1974) and *K & S Oil Well Serv., Inc. v. Cabot Corp.,* 491 S.W.2d 733

(Tex.Civ.App.1973) where the court's holding of no indemnity was based as much on the non-conspicuousness of the indemnity clause as any other rule of construction.

**4.** See Restatement (Second) of Torts § 402A, Comment g (1965).

the lessee (or here sublessee) assumed the cost of insurance procurement to guard against claims arising out of the use of the equipment.

■ Delta's argument that the policies giving rise to strict tort liability will be sacrificed by the court's construction of this agreement as imposing indemnity responsibility on it is misplaced. The policy behind strict tort as enunciated in Comment c to section 402A of the Second Restatement of Torts is to place the burden of accidental injuries on those who "market" the goods, the risk of which can be paid for by purchasing liability insurance. The agreement by Delta to procure liability insurance thus subserves the purpose of protecting the public from defective products by shifting the risk of payment to one better able to absorb it regardless of fault.[5]

Other courts dealing with a lease-indemnity agreement (although dealing with the lease of a fixed structure as opposed to a container) have held that the indemnitor's agreement to procure liability insurance conclusively established an indemnity in favor of an indemnitee whose fault arguably caused the injury complained of.

In *Hogeland v. Sibley, Lindsay & Curr Co.*, 42 N.Y.2d 153, 397 N.Y.S.2d 602, 366 N.E.2d 263 (1977) a lease was entered into containing an indemnity agreement which failed to explicitly mention the indemnitee's negligence. Included in the agreement, as here, was a provision obligating lessee to obtain public liability insurance inuring to the benefit of the lessor. An injury occurred and lessor was found proportionately at fault. It sought to enforce the indemnity agreement. Lessee indicated that without a clear specification, the indemnity agreement should not be construed to cover the indemnitee-lessor's negligence. The court noted that the intent of the parties, as garnered from the contract as a whole, should be determinative of the construction given the indemnity "rather than the semantic stereotypes with which an agreement may be phrased." *Id.* 397 N.Y.S.2d at 606, 366 N.E.2d at 266. The court observed that the parties involved were sophisticated business entities dealing at arm's length and indicated that the language was broad enough to include indemnification against lessor's negligence. Vital to the court's decision that lessor's negligence was covered by the indemnity was the insurance procured for its benefit. The court noted that lessor was not exempting itself from liability but rather that the parties were allocating risks between themselves through the employment of insurance.

Also instructive is *Hastreiter v. Karau Buildings, Inc.*, 57 Wis.2d 746, 205 N.W.2d 162 (1973). There the indemnity provision provided a general hold harmless agreement as well as an agreement by lessee to carry and pay for public liability insurance. The court held that,

> The purpose of the public liability insurance clause can only be to protect the landlord from some liability which it sustains as the owner of the building. But, having contracted away the right to possession, it is liable only for structural defects or a failure to maintain or repair the building.

> The public liability insurance clause is intended to protect the landlord from the effects of his own negligence. The only issue is the scope of the protection accorded. To construe the indemnification provision as the appellant argues would be to

**5.** The court, after the hearing on this motion, required Delta to inform it whether or not liability insurance had been procured pursuant to paragraph eleven. A policy naming Delta as primary insured and Strick as an additional insured issued by Transport Mutual Insurance Association was produced. The fact that that policy had a territorial exclusion, excluding the United States, and the fact that Delta has not informed the court of a policy covering the territorial United States is of no moment.

First, insurance was procured pursuant to the agreement naming Strick as insured evidencing Delta's acknowledgment of responsibility for injuries arising from use of leased Strick equipment. *Second, and more importantly, Delta's agreement to procure insurance placed it in the position of insurer regardless of whether or not a policy was procured. Tidewater Equip. v. Reliance Ins. Co.*, 650 F.2d 503, 506 (4th Cir. 1981).

make the hold harmless clause surplusage.

*Id.* 205 N.W.2d at 163–64, (citations omitted).

The same analysis applies here. If, as Delta urges, the hold harmless agreement indemnifies Strick only against the alteration or the failure to maintain the container after possession was ceded to Delta, the agreement would be *nudum pactum*; for Strick could have no liability for subsequent alteration of the container or failure to maintain it once it surrendered possession.[6] To adopt Delta's position, therefore, would be to force Delta to procure insurance for Strick's benefit, covering risks for which Strick could not be liable. Strick could have no conceivable interest in forcing that situation. The two clauses read together contemplate full indemnity accruing to Strick's benefit.

The South Carolina Supreme Court's acknowledgment of the prevalence of liability insurance as a factor in overruling long-standing common law immunities provides this Court with a compelling analogy. In overruling charitable immunity to a limited degree in *Brown v. Anderson County Hospital Association*, 268 S.C. 479, 234 S.E.2d 873 (1977), and in totally abrogating that immunity in *Fitzer v. Greater Greenville South Carolina YMCA*, 282 S.E.2d 230 (S.C.1981), the court noted that the general availability and procurement of liability insurance by charitable institutions to a large degree gutted the policy justifications for the immunity. The court in *Fitzer* noted that "the general availability of liability insurance ... underscores the unreasonableness of ... continued adherence to this archaic doctrine [of charitable immunity]." *Id.* at 231. (Citation omitted.) *See also Elam v. Elam*, 275 S.C. 132, 268 S.E.2d 109 (1980) (abolishing parent-child immunity, noting the prevalence of liability insurance as bearing on its abrogation of the immunity).

██ Certainly if the existence of liability insurance can alter deeply-rooted common

law immunities, Delta's obligation to procure excuses this court from applying the rule of construction urged by it, viz., that without specific reference to the indemnitee's fault an indemnity agreement will not be construed to cover the same. After all, the general rule of construction which governs all others is that the intention of the parties controls, with every provision of the agreement being read to give each its proper effect so as not to render any provision superfluous. *See generally Southern Railway v. Springs Mills*, 625 F.2d at 498.

Finally, the term of the lease and the hefty consideration involved bolsters the conclusion here reached. The lease is for a term of eight years, divesting Strick of all control and maintenance responsibilities for that period. (See paragraph ten.) Consideration for the lease was $2,234,064.00, payable in ninety-five (95) monthly installments of $23,271.50. These terms were assumed by Delta on its assumption of the lease.

The lengthy term of the lease, the hefty consideration, and the inability of Strick to control the units or maintain them all combine to bolster the clear language of the tenth paragraph and the requirement of the eleventh in placing responsibility on Delta (as sublessee) for "all loss and damage ... due to the death of ... any person as a result in whole or in part, the use or maintenance of the equipment ... while in the custody, possession and control of lessee." Properly structured economic risk-shifting in such a context is to be expected, especially in light of the recently evolved no-fault theories of liability against manufacturers of products.

Based on the above, Strick Corporation's motion for summary judgment of indemnity over against Delta is granted. Delta is therefore ordered to assume defense of the action against Strick Corporation and to pay any judgment rendered against Strick Corporation. The Clerk will enter judgment accordingly.

AND IT IS SO ORDERED.

---

**6.** In addition section ten of the lease provides that lessee is responsible for maintenance and repair.