736 F.2d 1078
 SEAL OFFSHORE, INC. and Sealcraft Operators, Inc.,
Plaintiffs-Appellees,
v.
AMERICAN STANDARD, INC., Westinghouse Air Brake Co., and
Wabco, Inc., Defendants-Appellees,
v.
E.F. HOUGHTON, Third-Party Defendant-Appellant.
 No. 83-2358.
 United States Court of Appeals,
Fifth Circuit.
 July 23, 1984.
 
 Morgan, Lewis & Bockius, Denis V. Brenan, Philadelphia, Pa., Fulbright & Jaworski, R. Scott Hogarty, Houston, Tex., for third party defendant-appellant.
 Brown, Sims & Ayre, James D. Wise, Jr., Lyn Van Dusen, Houston, Tex., for American Standard.
 John K. Meyer, Houston, Tex., for Seal Offshore, Inc. and Sealcraft.
 Appeal from the United States District Court for the Southern District of Texas.
 Before GARZA, GARWOOD and HIGGINBOTHAM, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 The M/V BERING SEAL ran into a dock. The vessel's owners, Seal Offshore, Inc., and Sealcraft Operators, Inc. sued American Standard, Inc., Westinghouse Air Brake Co., and Wabco, Inc., the makers of a throttle control on the BERING SEAL alleged to have caused the allision. The Wabco defendants in turn filed a third-party claim against E.F. Houghton, the manufacturer of one component of the throttle control. Houghton appeals from the judgment that Houghton indemnify Wabco for damages awarded to Seal. We affirm the judgment in favor of Seal, but reverse on the indemnification issue. We hold that the indemnification clause of Wabco's purchase order for the inlet valve manufactured by Houghton, strictly construed, does not indemnify Wabco for its own negligence and indemnity cannot be implied. We remand to the district court for apportionment of the damages between Wabco and Houghton.
 
 
 2
 * The BERING SEAL was clearing Pier 41 at Galveston, Texas when the allision occurred. Captain Charles Harris, an experienced mariner with an unblemished record, was at the controls. Captain Harris testified that as he left Pier 41 he realized he was moving ahead and to port more than he wanted. He tried to slow the forward movement by coming hard astern with both engines, but the boat continued ahead and to port faster. The vessel then struck and damaged the dock ahead of Pier 41.[1]
 
 
 3
 During the resulting inspection of the vessel, a small plastic disc-shaped inlet valve which was a part of the starboard throttle control was found to be softened and distorted. The district court found that the failure of the inlet valve, which had been manufactured by Houghton and incorporated into the throttle control by Wabco, had caused the allision. The court further concluded that Seal's lack of maintenance was not a cause of the valve failure, and held Wabco liable on both strict liability and negligence grounds. After finding Houghton also responsible, the court required Houghton to indemnify Wabco, relying alternatively on contractual indemnity and implied indemnity theories.
 
 II
 
 4
 The court held that the terms of Wabco's purchase order for the inlet valve obligated Houghton to indemnify Wabco. Printed on the back of the purchase order for the valve was this clause:
 
 
 5
 Seller [Houghton] shall protect, indemnify and save harmless Purchaser [Wabco] from and against any and all claims for ... damage to property in any manner arising out of, connected with, or incident to (i) any defects in goods sold to Purchaser under this Order regardless of whether such goods have been incorporated in or made a part of another product by Purchaser; (ii) any work performed hereunder by Seller on or about the premises of Purchaser or the presence on or about such premises of Seller, its employees, agents or subcontractors, and whether due to negligence of Purchaser or otherwise.
 
 
 6
 The district court having found that Wabco's negligence was a proximate cause of the allision, we face the "recurring question whether an indemnity agreement which makes no explicit reference to the indemnitee's negligence can nonetheless suffice to relieve the indemnitee of losses occasioned by its negligence." Brown v. Seaboard Coast Line R.R. Co., 554 F.2d 1299, 1302 (5th Cir.1977). Here this is a question of law, being solely a question of interpreting contractual language--no evidence having been presented regarding the meaning of the indemnity agreement beyond the language itself. See Paragon Resources v. National Fuel Gas Distribution Corp., 695 F.2d 991, 995-96 (5th Cir.1983).
 
 
 7
 Long-established general principles of interpreting indemnity agreements require that indemnification for an indemnitee's own negligence be clearly and unequivocally expressed. See, e.g., United States v. Seckinger, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); Batson-Cook Co. v. Industrial Steel Erectors, 257 F.2d 410, 412 (5th Cir.1958).[2] Standing alone the indemnity clause has an established legal meaning. An indemnification of "any and all claims" will not include the negligence of the indemnitee. See Mott v. ODECO, 577 F.2d 273 (5th Cir.1978), cert. denied, 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979); Brown v. Seaboard Coast Line R.R. Co., 554 F.2d at 1302 n. 3. Indemnity "is an area in which to cover all does not include one of the parts." Batson-Cook Co., 257 F.2d at 414 (emphasis in original). Significantly, in the second part of the clause Houghton explicitly indemnified Wabco against claims arising out of work performed by Houghton on Wabco's premises even if Wabco was negligent. The contrast between this latter provision and the indemnity covenant relied upon here cuts strongly against Wabco.
 
 
 8
 But, Wabco urges, there is additional language in the contract which evidences an intent that the indemnified claims include those resulting from its own negligence. The insurance clause immediately following the indemnity language, Wabco argues, is enough in combination with the indemnity clause itself to indicate an intent to shift a wide range of risks including its own negligence. The insurance clause reads:
 
 
 9
 Seller [Houghton] shall at its own expense provide and maintain insurance in amounts sufficient to protect Purchaser [Wabco] against all such claims [covered by the indemnity clause] for public liability property damage, and employee's liability and compensation; and from claims under any applicable Workmen's Compensation or Occupational Disease Acts and shall upon request furnish evidence satisfactory to Purchaser of the maintenance of such insurance by Seller.
 
 
 10
 Of course an insurance provision can so expansively shift risks that it is plain that contracting parties intended to include negligent acts in the indemnity obligation. See, e.g., Midland Ins. Co. v. Delta Lines, Inc., 530 F.Supp. 190 (D.S.C.1982). But the insurance clause did not require Houghton to insure Wabco against claims substantially beyond those subject to the indemnity clause; rather, it assured Houghton's ability to respond to the risks shifted to it by the indemnity clause.
 
 
 11
 Nor does reading this indemnity agreement as not covering Wabco's negligence strip its meaning, as in Midland Insurance Co., relied on by Wabco. Here the indemnity and insurance agreements protect Wabco from claims of strict liability that resulted solely from incorporating a manufacturer's defective product into Wabco's assembled product.
 
 
 12
 The underlying indemnity agreement does not present a close case of interpretation; basic principles of interpretation make plain that the indemnity agreement by itself cannot be read to cover Wabco's negligence. Further, because the insurance provision covers only risks shifted in the indemnity agreement, it expresses no intent to expand the indemnified risks or to include Wabco's own negligence. In short, the indemnity agreement taken as a whole cannot be read to cover Wabco's negligence.[3]
 
 
 13
 The district court alternatively ordered Houghton's indemnification of Wabco on an implied indemnity theory, classifying Wabco's fault as passive and Houghton's fault as active. The concept of active and passive negligence is of no aid to Wabco because as a footing for implifying indemnification it is at best a redundancy within a system of comparative fault. Whatever its earlier vitality in this circuit, it was not the law after our en banc opinion in Lewis v. Timco, 716 F.2d 1425 (5th Cir.1983). See also Loose v. Offshore Navigation, Inc., 670 F.2d 493, 500-502 (5th Cir.1982).[4] Timco establishes that comparative fault principles apply in maritime cases involving both negligence and strict liability. Though Timco was issued after the district court's decision here, we reject the suggestion that it be only prospectively applied. An appellate court must apply the law in effect at the time it renders its decision when the change in law does not extinguish a cause of action but only requires a new damage finding. See Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 101 S.Ct. 2870, 2879 n. 16, 69 L.Ed.2d 784 (1981); Lang v. Texas & Pacific Ry. Co., 624 F.2d 1275, 1279-80 & n. 9 (5th Cir.1980).
 
 
 14
 There being no express or implied indemnity, it follows that the damages awarded to Seal must be apportioned according to the relative fault of Wabco and Houghton, unless the district court's findings that both Wabco and Houghton were at fault in causing the allision, and that Seal was not, are clearly erroneous.
 
 III
 
 15
 The district court found Wabco negligent in not adequately testing and inspecting the inlet valves it incorporated into its throttle controls; Wabco knew there was a softening problem with the inlet valves, but had negligently assumed that the problem was due to outside forces, such as improper lubricants, rather than defective valves. The court further found Wabco's negligence to have been a proximate cause of the allision. We cannot find clearly erroneous the district court's conclusion that Wabco's failure to test thoroughly for the valve's defectiveness was a negligent and proximate cause of the allision.
 
 
 16
 There was evidence that after 1976 Wabco received approximately 68 complaints of a softening or "bowing" problem with the valves. Wabco informed Houghton, and Houghton confirmed Wabco's suspicion that the problem could be caused by external influences. More adequate testing could have informed Wabco of the defect in the inlet valve, and the purchasers of the throttle controls could have then been informed of the problem.
 
 
 17
 Relatedly, Wabco argues that despite the findings of negligence and proximate cause, the district court's finding that Wabco's role was "passive" implicitly found Wabco to be without fault. The argument is without merit. The "finding" of a passive role was no more than a characterization of a duty breached by negligently failing to act rather than a duty breached by negligently acting.
 
 IV
 
 18
 Houghton next launches a direct attack upon the district court's findings of fact. Houghton argues that the inlet valve was not defectively manufactured, and that the deterioration of the inlet valve was due to external forces; that the utility of the design of the inlet valve outweighed any risks, and therefore that the design was not defective; that, if the valve was defectively designed, Wabco was solely responsible for the design. Turning from the defectiveness issue, Houghton argues that Seal's maintenance was negligent and a proximate cause of the allision; that the cause of the allision was not the inlet valve in question at all, but rather pilot error, the port engine or the port throttle control. Finally, Houghton argues that the damages were insufficiently proved and too high. These arguments sum to little more than an effort to retry the case on appeal. The district court's findings are not clearly erroneous. We pause only to discuss those assertions of deficient facts which have arguable merit, rejecting the balance without elaboration.
 
 
 19
 The court found that the cause of the deterioration of the inlet valve was improper manufacturing and design rather than environmental factors or inadequate maintenance. An expert testified that the inlet valve had softened from the inside out, rather than from the outside in, as would have been the case had the problem arisen from external factors such as an improper lubricant. Experts also expressed opinions that the manufacturing problem could have been in inadequate curing of the valve's materials, or in the inclusion of water in the rubber compound, and that the polyurethane chosen was more susceptible to deterioration than other comparable materials. Finally, there was testimony explaining the theory that deterioration of the inlet valve caused the starboard throttle control to malfunction.
 
 
 20
 Houghton contends that the experts improperly assumed that the inlet valve was not subject to sustained, extreme conditions of heat and moisture that could have caused the deterioration; that the experts did not adequately test for this possibility, or the possibility that lubricants had caused the problem; that plaintiffs' experts expressed conflicting opinions as to the cause of the problem; and that deterioration of the inlet valve was not sufficient to cause the throttle control to fail.
 
 
 21
 We find no merit to any of these arguments. In particular, the asserted conflict in testimony was resolvable by the district court in a manner consistent with his conclusion. Ralph Parshall, Seal's repairman, testified that after observing the valve he thought wear had probably caused the deterioration. In contrast, Seal's scientific expert, Jerry Leyden, carried out laboratory testing and testified that improper manufacturing had caused the problem. It was not error to rely on Leyden instead of Parshall.
 
 
 22
 Houghton's attack upon the district court's finding that Houghton "was negligent in failing to correct its manufacturing process" is more troublesome. If the finding was that Houghton was negligent in its manufacture of the inlet valve, it is plainly supported by the evidence, including the expert testimony relied on by the court in its finding that the inlet valve had a manufacturing defect. Houghton makes the legitimate point, however, that the trial court improperly supported its finding by a conclusion that Houghton had notice from Wabco of the softening problem. The district court also found that Houghton sold the particular accused inlet valve to Wabco before Wabco told Houghton of the softening problem, leaving unanswered the question of what the failure to correct the manufacturing process after notice from Wabco had to do with the vessel hitting the dock. Regardless, we need not resolve this ambiguity because the district court can do so when it apportions liability on remand.
 
 
 23
 Houghton next blames Seal for the allision. We have already addressed Houghton's argument that conditions on the vessel rather than the defectiveness of the inlet valve were responsible for its softening. Houghton also argues that Seal's allegedly negligent maintenance and failure to inspect was at least partly responsible for the allision in that the defective valve should have been discovered by Seal. Seal did not inspect the valve during the approximately three and a half years it was on the vessel before the allision occurred. The trial court found no negligence, however, noting that the instructions accompanying the throttle control did not adequately inform Seal of the need for inspection. The finding was not clearly erroneous.
 
 
 24
 Houghton continues arguing as to the trier of fact that the allision could not have been caused by a failure of the starboard throttle control of which the inlet valve in question was a part, and that the allision was caused either by pilot error, a problem with the port throttle control or a problem with the port engine. Of the two methods by which Captain Harris could have cleared Pier 41, only one depended on the starboard throttle control. We cannot find clearly erroneous the trial court's finding that the method used was the one needing the starboard throttle control, and that its failure caused the allision.
 
 
 25
 We affirm in every respect, except the conclusion that Houghton is obligated to indemnify Wabco. We remand for an apportionment of damages according to the comparative fault of Houghton and Wabco.
 
 
 26
 AFFIRMED in part, VACATED in part, and REMANDED.
 
 
 
 [1]
 Duval Corporation, the owner of the struck dock, settled with Seal before trial in this case; the damages awarded to Seal include not only the damages to the BERING SEAL but also to Duval's dock
 
 
 [2]
 Although Houghton says that state law governs the interpretation of the contract, we need not reach the point, and instead simply rely on the language of the particular agreement and on established general principles of interpretation of indemnity agreements. None of the parties argue other than from general principles, and no argument is made that choice of law has any significance here
 
 
 [3]
 Because of our interpretation of the indemnity agreement, we need not reach the "battle of the forms" issue raised by Houghton as to whether the indemnity agreement was actually part of the contract between Wabco and Houghton, or the issue of whether Wabco gave adequate notice of its claim for contractual indemnity
 
 
 [4]
 Even if the concept that passively negligent tortfeasors should be indemnified by actively negligent tortfeasors were compatible with comparative fault, and we hold it is not, "we have narrowly defined the concept of passive negligence, restricting it to situations in which the so-called 'passive' tortfeasor was merely vicariously liable for the torts of another and those in which the liability was imposed on him for some other technical reason unrelated to personal fault." Loose, 670 F.2d at 499-500. Wabco's negligence does not fit within these categories and would therefore not qualify as "passive" in any event. We do not reach the question of whether Wabco would be entitled to noncontractual indemnity if it had not been negligent and its liability to Seal were based entirely on strict liability for the identical defect in the valve for which Houghton was liable to Wabco in strict liability or negligence or both