**AMOCO PRODUCTION COMPANY, and Texaco, Inc., Plaintiffs–Appellants,**

v.

**FOREST OIL CORPORATION, et. al., Defendants–Appellees.**

No. 86–3872.

United States Court of Appeals, Fifth Circuit.

May 10, 1988.

---

Ronald A. Johnson, New Orleans, La., for plaintiffs-appellants.

G. Alex Weller, Cornelius G. Van Dalen, New Orleans, La., for Kerr–McGee.

James E. Wright, Jr., New Orleans, La., for CNG & Texas Gas, et al.

Timothy F. Burr, New Orleans, La., for Cabot Corp.

F. Douglas Gatz, Jr., Ralph E. Kraft, Andrew H. Meyers, Lafayette, La., for Forest Oil.

Before THORNBERRY, GARWOOD, and HIGGINBOTHAM, Circuit Judges.

GARWOOD, Circuit Judge:

This case involves a dispute over the proper interpretation of a letter agreement between plaintiffs-appellants Amoco Production Company and Texaco, Inc. (hereinafter collectively referred to as Amoco), and defendants-appellees Forest Oil Corporation, Cabot Corporation, CNG Producing Company, CSX Oil & Gas Corporation (formerly Texas Gas Exploration Company), Columbia Gas Development Corporation, Sun Operating Limited Partnership (formerly Sun Oil Company), Felmont Oil Corporation, and Kerr–McGee Corporation (hereinafter collectively referred to as Forest). Following a bench trial, the district court entered judgment in favor of Forest and dismissed the suit. Amoco appeals. Finding no error, we affirm.

**Facts and Proceedings Below**

The following facts are not in dispute. Amoco owned a lease located on the outer continental shelf in the Eugene Island Area, Block 273 off the coast of Louisiana. Amoco and Forest were parties to the Eugene Island Block 273 Field Unit, and Forest was the operator of the Unit. Forest operated an oil and gas platform known as 273 "A," while Amoco, as operator of the Block 273 "B" lease, operated a platform known as 273 "B."

Wells were drilled from the Forest 273 "A" platform to develop and produce certain shallow gas sands ranging in depth from 2,000 to 4,500 feet, including the 3,500 foot "B-sand." Wells from Amoco's 273 "B" platform extended through and beyond the 3,500 foot B-sand to develop sands in the 7,000 to 8,000 foot range. As the operator of the Block 273 Field Unit, Forest evaluated the 3,500 foot B-sand and wished to determine whether it was necessary to install compressors on the 273 "A" platform. Thus, on behalf of the Field Unit, Forest wrote to Amoco requesting that Amoco run a "TDT–K log" from the 273 "B" platform into Well No. B–3 from approximately 2,600 to 5,600 feet. It seems that the B–3 well was particularly suitable for indicating water encroachment in the 3,500 foot B-sand and for running the diagnostic tests to determine the need for compression.

Both parties contemplated a simple letter agreement to provide for this particular operation. The final letter agreement was drafted by Amoco and signed by the parties in November 1978. The agreement states in pertinent part:

"The purpose of this letter is to set forth the agreement between Amoco and Forest Oil Corporation as operator of the Eugene Island Block 273 Field Unit, relative to contemplated operations on the OCS–0987 Well No. B–3, operated by Amoco for itself and Texaco, Inc.

"Forest Oil Corporation, as operator of said unit, has requested, and Amoco,

with the approval of Texaco, Inc., has agreed to run a TDT–K Log in the OCS–0987 Well No. B–3 in the Eugene Island Block 273 Field.

"This specific operation shall be performed by Amoco for the account of the Eugene Island Block 273 Field Unit, Forest Oil Corporation, Operator, and at the sole cost, risk and expense of said unit. The log will be run to a measured depth of 5,600′ and delivered to Forest Oil Corporation, as Unit Operator. The estimated gross cost to run the log is $12,000. After the actual cost has been determined, Amoco will submit billing to Forest."

The "specific operation" referred to in the third paragraph included not only the running of the TDT–K log but also the transportation of the necessary equipment to and from the platform.

On February 4, 1979, logging operations were conducted on Amoco's platform pursuant to the parties' letter agreement. After the TDT–K log was run into the B–3 well bore, an Amoco crane, operated by an Amoco employee, began offloading the wireline unit from the platform onto an awaiting vessel. While the wireline unit was being lifted, however, the crane toppled into the Gulf of Mexico, resulting in damage to both the crane and wireline unit. The cause of the fall was solely the negligence of the Amoco crane operator. The wireline unit belonged to a third party, Amoco having rented it.

Amoco subsequently filed this action against Forest in district court seeking damages for the loss of the wireline unit and crane in the accident. Amoco basically argued that Forest was liable under the terms of the letter agreement, in which it was agreed that the "specific operation" would be run at the "sole cost, risk and expense" of Forest. According to Amoco,

this provision includes losses arising from Amoco's sole negligence.

After a bench trial, however, the district court determined that the parties' letter agreement contained no clear, unambiguous, and unequivocal statement that Forest and the Field Unit would pay Amoco for losses resulting solely from its negligence. The district court also found that Amoco had failed to prove by a preponderance of the evidence that it was the intention of the parties in signing the letter agreement that Forest and the Field Unit would assume all such risks, even those resulting from Amoco's sole negligence. Accordingly, the district court entered judgment in favor of Forest and dismissed Amoco's complaint. This appeal followed.

### Discussion

#### I. Interpreting the Letter Agreement

Jurisdiction in this case is predicated on the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333. Under section 1333, the applicable law is that of the state adjacent to the site of the accident. In this case, the adjacent state is Louisiana. Thus, applying Louisiana law, we must determine whether Forest is contractually obligated to indemnify Amoco for losses arising from Amoco's sole negligence.

Amoco contends that under the "sole cost, risk and expense" provision, Forest assumed all risks and agreed to pay all costs, even those arising solely from Amoco's negligence. Under Louisiana law, however, an indemnification agreement will not be construed to cover losses arising from the indemnitee's negligence unless a mutual intent to provide such indemnification is expressed in unequivocal terms.[1] *See Polozola v. Garlock,* 343 So.2d 1000, 1003 (La.1977); *Graham v. Milky Way*

---

1. Amoco argues that the "sole cost, risk and expense" provision in the letter agreement is an allocation of risk provision rather than an indemnity provision. Amoco apparently relies on the language in *In re Incident Aboard D/B OCEAN KING,* 758 F.2d 1063 (5th Cir.1985), for this distinction. In that case, the court noted that the contract in question contained an allocation of risk provision rather than an indemni-

ty provision. *Id.* at 1067. However, neither Amoco nor the *OCEAN KING* case explains the analytical difference between the two types of provisions. In any event, Amoco stated at oral argument that it is effectively seeking indemnification in the present action. Accordingly, we see no reason to draw a distinction under the present circumstances.

*Barge, Inc.,* 824 F.2d 376, 385 (5th Cir. 1987) (applying Louisiana law); *Foreman v. Exxon Corp.,* 770 F.2d 490, 498 (5th Cir.1985) (same). This rule accords with established principles governing the interpretation of indemnity agreements, *see United States v. Seckinger,* 397 U.S. 203, 90 S.Ct. 880, 885, 25 L.Ed.2d 224 (1970) (applying federal law); *Seal Offshore, Inc. v. American Standard, Inc.,* 736 F.2d 1078, 1081 (5th Cir.1984), and helps to ensure that an indemnitor has express notice that under the agreement, and through no fault of its own, it may be called upon to pay damages caused solely by the negligence of its indemnitee. *See Foreman,* 770 F.2d at 498; *Corbitt v. Diamond M Drilling Co.,* 654 F.2d 329, 333 (5th Cir. 1981) (applying maritime law).

■ This rule does not require any "magic words" for an agreement to cover the indemnitee's negligence, *see In re Incident Aboard D/B OCEAN KING,* 758 F.2d 1063, 1068 (5th Cir.1985), nor does it necessarily require an express reference to "negligence" as such. *See Battig v. Hartford Accident and Indemnity Co.,* 482 F.Supp. 338, 343–44 (W.D.La.1977), *approved in Hyde v. Chevron U.S.A., Inc.,* 697 F.2d 614, 633 (5th Cir.1983).[2] But an agreement whereby one party purportedly agrees to indemnify another against his negligence must be strictly construed, *see Polozola,*

343 So.2d at 1004, and in the absence of clear, express, and specific language plainly demonstrating that this was the parties' intention, such an agreement will not be read to include the indemnitee's own negligence. *See Knapp v. Chevron U.S.A., Inc.,* 781 F.2d 1123, 1127–28 (5th Cir.1986) (applying Louisiana law).

■ We agree with the district court's conclusion that the letter agreement does not contain clear and specific language plainly demonstrating a mutual intent to provide indemnification for Amoco's negligence.[3] We are not persuaded by the argument that the phrase "sole cost, risk and expense" means everything that it literally says—*i.e.*, that Forest would assume literally *all* costs and *all* risks—for such an interpretation would imply that Forest assumed the risk of Amoco's intentional conduct as well as its negligent behavior. In Louisiana, however, it has long been held that a party may not shift liability for its future intentional acts. *See Elmer v. Coplin,* 485 So.2d 171, 177 (La.Ct.App.), *writ denied,* 489 So.2d 246 (1986) (citing *Hayes v. Hayes,* 8 La.Ann. 468 (1852)). *See also Diamond Crystal Salt Co. v. Thielman,* 395 F.2d 62, 65 (5th Cir.1968). The phrase may therefore include some risks, but it certainly does not include literally all risks.[4]

---

2. In *Battig* the court found that:
"Louisiana does not require a specific reference to negligent acts in order for an indemnity agreement or a release to cover claims based on negligent acts. However, the intention of the parties, as inferred from the language of their agreement, must clearly indicate an intention to include negligent acts within the indemnity agreement or the release." 482 F.Supp. at 343–44.
We reached the same conclusion in *Hyde,* 697 F.2d at 633. *See also OCEAN KING,* 758 F.2d at 1068 & n. 7.

3. The generally accepted rule is that the interpetation of an unambiguous contract is a question of law, subject to *de novo* review. *Graham,* 824 F.2d at 381; *Kemp v. Hudnall,* 423 So.2d 1260, 1261 (La.Ct.App.1982), *writ denied,* 428 So.2d 474 (La.1983). The same rule applies to a determination of whether the contract is ambiguous *vel non. Paragon Resources v. National Fuel Gas Distribution,* 695 F.2d 991, 995 (5th Cir. 1983). *See also Chevron U.S.A., Inc. v. Belco Petroleum Corp.,* 755 F.2d 1151, 1153–54 (5th

Cir.), *cert. denied,* 474 U.S. 847, 106 S.Ct. 140, 88 L.Ed.2d 116 (1985) (under Louisiana law, the facial interpretation of a contract is a question of law not subject to the clearly erroneous standard).

4. Indeed, to say that the "sole cost, risk and expense" provision encompasses literally *all* risks inherent in the operation is to say that Forest effectively agreed to assume the risk of Amoco's failure to perform and that Forest would be liable to Amoco even if Amoco deliberately pushed the crane and the wireline unit into the Gulf. We think this interpretation is unreasonable and untenable. As we stated in *Makofsky v. Cunningham,* 576 F.2d 1223, 1230 (5th Cir.1978), "Informed and experienced parties do not ordinarily bind themselves to unreasonable obligations." We therefore conclude that the provision should not be interpreted to include literally all risks imaginable.

Our conclusion that "sole risk" does not encompass literally all risks, including negligence, is in accordance with well-established rules gov-

But what is not clear from the terms of the agreement is which risks the parties intended to include.[5] Terms such as "sole risk" and "sole cost" are nonspecific terms, and under Louisiana law nonspecific terms must be interpreted to cover only those things it appears the parties intended to include.[6] In the present case, the parties may have intended to include risks associated with negligence, or they may have intended to include only "ordinary" risks that are normally associated with this type of logging operation, such as an act of God, an intentional or negligent act of a third party, or common problems encountered in a gas well. But the general terms used in the letter agreement do not make it clear which risks the parties intended to include. In any event, the terms in the agreement certainly do not clearly and unequivocally express a mutual intent to provide indemnification for Amoco's sole negligence; therefore, the agreement should not be interpreted to include such indemnification.[7]

erning indemnity provisions in general. As we have stated before, indemnity "is an area in which to cover *all* does not include one of its parts." *Seal Offshore, Inc. v. American Standard, Inc.*, 736 F.2d 1078, 1081 (5th Cir.1984) (citing *Batson–Cook Co. v. Industrial Steel Erectors*, 257 F.2d 410, 412 (5th Cir.1958)) (emphasis in original). Thus, an indemnification of "any and all claims" will not include claims arising from the negligence of the indemnitee, despite the otherwise all-inclusive language in the provision. *Id.* at 1081. *See also Knapp*, 781 F.2d at 1127–28 (agreement requiring indemnitor to indemnify indemnitee from "any loss, expense, claim or demand" does not cover the negligence of the indemnitee).

5. The "sole cost, risk and expense" provision, standing alone, certainly does not identify any specific costs or risks. In fact, there is no other mention of risks anywhere else in the agreement. The only other reference to cost is the estimated gross cost to run the log ($12,000), but nothing in the agreement indicates that this cost includes costs arising from Amoco's negligence. In short, the letter agreement, even when read as a whole, does not express in clear and unambiguous terms a mutual intent to include Amoco's sole negligence as one of the contemplated risks or to provide indemnification for losses arising therefrom.

6. *Cf. Sovereign Ins. Co. v. Texas Pipe Line Co.*, 488 So.2d 982, 984–85 (La.1986). In that case, the Louisiana Supreme Court noted that: "Although the contract provides that Atlas shall

In support of its position, Amoco relies heavily on *In re Incident Aboard D/B OCEAN KING*, 758 F.2d 1063 (5th Cir. 1985), in which this Court interpreted an allocation of risk agreement under Louisiana law. There, Cities Service sought to recover from Ocean Drilling and Exploration Company (ODECO) losses arising from a blowout on the drilling barge OCEAN KING. ODECO's negligence contributed to the losses. Nonetheless, ODECO argued that its drilling contract with Cities Service allocated any loss associated with a blowout to Cities Service. ODECO based its claim on the following contractual language: "In the event a well drilled hereunder shall blow out or crater from any cause it is understood that operator [Cities Service] shall bear the entire cost and full liability of killing the well and bringing it under control." *Id.* at 1067.

Cities Service argued that since the provision above did not expressly state that it relieved ODECO of its own negligence, it

indemnify and hold Texas harmless against each and every claim, demand or cause of action and any liability, such general terms must be interpreted to cover only those things it appears the parties intended to include." *Id.* at 985. The same rule should apply with regard to the general terms under review here. *See also* La.Civ.Code Ann. art. 2051 (West 1987), which restates the rule of La. Civ. Code art. 1959 (1870). Article 2051 provides: "Although a contract is worded in general terms, it must be interepreted to cover only those things it appears the parties intended to include."

7. *See Knapp*, 781 F.2d at 1127–28. Furthermore, under Louisiana law doubts or ambiguities as to the meaning of a contract must, if not otherwise resolvable, be eliminated by interpreting the contract against the party who prepared it. *See Mott v. ODECO*, 577 F.2d 273, 278 (5th Cir.), *cert. denied*, 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1978) (under Louisiana law, ambiguities in contracts are generally construed against the draftsman). *See also* La. Civ. Code Ann. art. 2056 (West 1987), which follows the principles stated in La. Civ. Code art. 1958 (1870). Article 2056 provides that "[i]n case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text." In this case, Amoco prepared the letter agreement containing the "sole cost, risk and expense" provision. Thus, given the doubts as to the exact scope of the provision, it should be construed against Amoco.

did not relieve ODECO of liability for losses arising from the blowout. In other words, Cities Service apparently argued that a specific reference to ODECO's negligence had to be included in the contract for the court to find that ODECO was released from its negligence. We rejected this argument, noting that Louisiana law does not require an express reference to negligence in order to relieve a party of the risks of its own negligence. Indeed, the Court noted that instead of an express reference or any other "magic words," the most important consideration is the intent of the parties to the contract. *Id.* The Court ultimately determined that the parties intended to make Cities Service liable for losses attributable to ODECO's negligence. In reaching that conclusion, the Court found that:

> "In the instant case, gas intruded into the well bore and the gas pressure eventually overcame the blow out preventer. Such a contingency was certainly foreseeable as a cause of a blow out. Likewise, negligence on the part of both Cities [Service] and ODECO in handling the crisis situation was equally foreseeable by both parties. The phrase 'from any cause' unambiguously includes ODECO's own negligence." *Id.* at 1069.

Apparently relying on similar reasoning, Amoco seems to argue that its negligence was a foreseeable risk and that the "sole cost, risk and expense" provision unambiguously included costs and risks relating to its own negligence.

But *OCEAN KING* is properly distinguished from the present case. First of all, the provision in *OCEAN KING* was much more specific than the general "sole cost, risk and expense" provision now under review. Indeed, the provision in *OCEAN KING* referred to a specific risk, the risk of a blowout. The provision also stated unequivocally that Cities Service would bear the "entire cost" and "full liability" of killing the well and bringing it under control in the event of a blowout "from any cause." As the Court stated in *OCEAN KING*, gas intruding into the well and pressure overcoming the blowout preventer, as well as ODECO's negligence, were certainly foreseeable causes of a blowout. Likewise, negligence on the part of either party in handling the crisis situation was equally foreseeable. Thus, Cities Service must have known and understood the risks it bore under the agreement, and the phrase "entire cost and full liability" made it clear that Cities Service would assume complete liability for damages arising from a blowout in the event one occurred.[8]

■ In contrast, the provision in the present case does not refer to a specific risk, nor does it include the "any cause" language. Significantly, the instant provision does not even mention liability (much less "full" liability), which in most contexts suggests that the beneficiary of the provision is to be relieved of the consequences of some fault on his part. Unlike the clearer and relatively specific language in *OCEAN KING*, the general terms of the letter agreement in the present case simply do not express in sufficiently plain terms which risks and costs the parties intended to shift to Forest. Thus, unlike Cities Service, Forest did not have sufficient notice of the specific risks it supposedly bore, nor of the extent of the exposure it supposedly assumed. As stated before, a party to an agreement is entitled to express notice that it may be called upon to pay damages for the sole negligence of the other party. *See Foreman,* 770 F.2d at 498. Whereas the provision in *OCEAN KING* adequately gave such notice, the one in the present

---

**8.** In the context of the *OCEAN KING* provision, the term "full liability" strongly suggests an obligation which would arise only as a result of negligence or intentional conduct. Since a party cannot shift liability for its future intentional conduct, *Elmer,* 485 So.2d at 177, the parties obviously intended to shift liability for negligence. Otherwise, the provision respecting "full liability" would have little meaning. In the present case, however, the term "liability" is not used and the term "risk" could include a person's negligence, natural disasters, unavoidable accidents, or common problems encountered in this kind of work. But the risks that were contemplated here are not clearly evident from the general term "sole risk" or from any other language in the agreement.

case did not.[9] Accordingly, *OCEAN KING* does not dictate the result here.

## II. Determining the Intent of the Parties

Finding ambiguity in the "sole cost, risk and expense" provision, the district court in this case nevertheless looked to extrinsic evidence to determine the intent of the parties. After considering the testimony of witnesses from both sides, including the Amoco and Forest representatives who signed the letter agreement, the district court concluded that Amoco had failed to prove by a preponderance of the evidence that the parties intended to include Amoco's negligence in this provision of the agreement. On appeal, Amoco contends that the court erred in arriving at such a conclusion, and it contends that the district court erred in failing to admit into evidence another document, Plaintiff's Exhibit 11, in which Forest used the term "sole cost, risk and expense" as part of an indemnification provision. Amoco also contends that the district court erred in failing to allow Amoco to cross-examine the Forest representative on the content and meaning of the indemnification provision in the latter document. We reject these contentions.

■■■ First of all, we reject Amoco's contention that the district court abused its discretion [10] in failing to admit as evidence Plaintiff's Exhibit 11. Plaintiff's Exhibit 11 is a portion of a wholly unrelated written agreement between Amoco and Forest that contains a comprehensive indemnification provision which does not include the term "negligence." E.L. Villarreal, the Forest representative who signed the letter agreement now under review, had nothing to do with nor any personal knowledge of Plaintiff's Exhibit 11. During its cross-examination of Villarreal, Amoco sought to introduce Plaintiff's Exhibit 11 for impeachment purposes to show that when Forest intends to include indemnification for negligence, it does not necessarily include the term "negligence" in the indemnity agreement. However, Villarreal had not stated that Forest includes the term "negligence" whenever it intends to provide for such indemnification.[11] Thus, since Plaintiff's Exhibit 11 did not impeach Villarreal's testimony, the district court did not abuse its discretion by refusing to admit it as impeachment evidence. We likewise reject Amoco's assertion that the district court reversibly erred in refusing to allow Amoco to cross-examine Villarreal on the content and meaning of Plaintiff's Exhibit 11. The district court has discretion in limiting the scope of cross-examination with respect to such collateral matters, and we find no abuse of that discretion here, and certainly no cause for reversal.

Finally, the record does not support Amoco's contention that it conclusively

9. Moreover, the result in *OCEAN KING* seems to be based in part on the fact that the agreement in that case was the product of extensive negotiations. After addressing the question of ambiguity, the panel in *OCEAN KING* concluded by stating: "This Court notes that the instant contract was the result of extensive negotiations between the parties and this Court declines to adopt an interpretation of this contract that contravenes what is perceived to be the parties' intent." 758 F.2d at 1069. In contrast, the evidence in the present case indicates that the agreement between the parties did not involve prior negotiations.

10. *See Jon-T Chemicals, Inc. v. Freeport Chemical Co.,* 704 F.2d 1412, 1417 (5th Cir.1983).

11. Villarreal did testify that when Forest intends to include negligence in an indemnification agreement, it expands the language of the phrase "sole cost, risk and expense" to reflect that intent, but he had not testified that Forest uses the word "negligence" under such circumstances.

After Plaintiff's Exhibit 11 had been offered to impeach Villarreal's testimony on the theory that he had testified that Forest would use the term "negligence" if such were intended to be covered in an indemnity agreement, objection was made on the ground that Villarreal had *not* so testified; then, Amoco's counsel further cross-examined Villarreal, and his somewhat confused answer to this further cross-examination may be interpreted as saying that he *had* testified that the word "negligence" would be used; however, in fact he had *not* so testified (as examination of the transcript reveals), and before he completed his referenced answer, the court interrupted stating, "I don't think this has anything to do with any prior testimony." The court was not obliged to allow Amoco to bootstrap Plaintiff's Exhibit 11 into admissibility by this means. This incident does not present reversible error.

258

proved that the parties intended to provide indemnification for Amoco's negligence. The letter agreement itself does not establish such a mutual intent, nor does the testimony of those involved in the transaction. Villarreal specifically stated in his testimony that it was not his intent in signing the agreement for Forest to assume the risk of Amoco's negligence. Villarreal was apparently the only one who reviewed the document for Forest or made the agreement on its behalf. H.P. Riley, the representative who signed the letter agreement on behalf of Amoco, testified in his deposition that he did intend to include indemnification for Amoco's negligence, but he also stated that he never participated in negotiations with Forest or otherwise communicated his intent to Forest prior to the execution of the agreement.[12] The trial testimony of Richard Spies, a witness for Amoco, indicates that he did not take part in the drafting of the letter agreement, nor did he have any discussions with regard to any negotiations that may have occurred prior to the signing of the agreement. The district court did not err in concluding that Amoco had not proven that the parties intended to provide indemnification for Amoco's negligence.[13]

### Conclusion

The letter agreement between Amoco and Forest does not establish a mutual intent to provide for indemnification for Amoco's negligence in sufficiently clear, express, and specific language to meet the requirements of Louisiana law. The district court's finding that Amoco failed to establish that Forest agreed to assume all risks, even those arising from Amoco's sole negligence, is not clearly erroneous. None

of the asserted trial errors presents grounds for reversal of this bench-tried case. Accordingly, we affirm the district court's judgment in favor of Forest.

AFFIRMED.

---

12. Riley also testified that he was not aware of any negotiations between Forest and Amoco prior to the execution of the letter agreement.

13. Implicit in the district court's conclusion is a finding that there was not a mutual intent to include indemnification for Amoco's negligence. When a district court resorts to extrinsic evidence to determine the parties' intent, its determinations are findings of fact. *Paragon*, 695 F.2d at 995. Accordingly, such findings are subject to the clearly erroneous standard of review, Fed. R. Civ. P. 52(a), and we may reverse

only if after examining the entire record we are left with a definite and firm conviction that a mistake has been made. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). After examining the record, we are not left a definite and firm conviction that a mistake has been made. To the contrary, we find that the record supports the district court's implicit finding that there was not a mutual intent to provide indemnification for Amoco's negligence.